Tilghman C. J.
The trustees of the Roman Catholic Society worshipping at the church of St. Mary,” have proposed certain alterations of their chatter, the lawfulness of which has.been submitted to this. Court, by virtue of an Act of Assembly passed the 18th of March last. This corporation was instituted-by an -Act of Assembly passed the 13th of September, 1788, and consequently was not authorised to procure an amendment of its charter under the general provisions of the Act of 6th April, 1791, entitled an Act to confer on certain associations of the citizens-of this Commonwealth, the powers and immunities of corporations of bodies politic in law. It was necessary, therefore,, to resort to the supreme power of the Legislature, by whose authority expressed in the Act of 20th March,-1821, this religious society Was empowered to improve, amend, and alter .the charter of incorporation granted by the Act of 13th September, 1788, in the same manner, and with the same privileges and powers, as corporations established. by virtue of the Act of 6th April, 1791. ' . ,
' We must examine the last mentioned Act, therefore, in order to understand what is our authority and what our duty on the present occasion. And. on reference to it, we find, that in the first place it authorises any number of persons, citizens of this Commonwealth, who have- associated, them-' selves for any literary, charitable* or. religious purpose, to acquire the rights of a corporation, on such terms and condi *529 tions as they may think proper, provided the instrument of incorporation be submitted, first to the Attorney General, and afterwards to the Court, and both express their opinion ir, writing, “ that the objects, articles and conditions, therein set forth and contained, are lawful.” It is then provided, by the 2d section, “ that as often as the corporations established by virtue of that Act, and the successors thereof respectively should be desirous of improving, amending or altering,'the articles and condition's of the instrument upon ■which they -were respectively formed and established, it should be lawful for such corporations respectively, in like manner, to specify the improvements, amendments or alterations which should be desired, and the same to present to the Attorney General and Supreme Court, who should in like manner certify their opinion, touching the lawfulness of such improvements, amendments and alterations.”
On applications for amendments under this Act of Assembly, difficulties may arise, which do not seem to have entered into the contemplation of the Legislature. When a society wishes, to be incorporated, an instrument is prepared, and signed by the members of the society individually, so that the unanimous desire of the signers appears clearly to the Court. But when alterations are proposed, the case is different. It is scarcely possible to prove that every individual who has rights or privileges under the charter, has assented to the alterations. And yet the expressions of the Act are, that it shall be lawful for the said corporations in like manner to specify the improvements, &c. This is all very well, and every thing goes on smoothly, while there is no difference of opinion in the members of the corporation. But suppose there should be a difference, and that what is proposed by one party, should be objected to by the other.
A difficulty of that kind arose, when many of the members of the religious society of St. Mary's, in their individual capacity, applied to the Court for an alteration of their charter, at the last March Term, and were opposed by the trustees in their corporate capacity. The Court then decided, that it was not authorised to certify its opinion, touching the lawfulness of the proposed alteration, because the proposal did not come from the trustees, in whom were vested the corporate powers of its society. The reasons which induced the *530 Court to come to that conclusion, appear in the opinion’ which was then delivered, and it is unnecessary to repeat them.
Since the last I'erm, new trustees have been elected, who ¿iffer jn sentiment from their predecessors, and now the pro-r 7 ,,i posal for alteration comes from the trustees, under the seal of the charter. But another difficulty has started up. This corporation consists of eight lay, and three clerical members. The laity are for an alteration, but the clergy dissent. What is to be done in this predicament? Is the Court bound to consider the proposal for alteration of the charter as the act of the corporation, because it is presented under the corporate seal ; or may it look beyond the seal, and inquire in what manner, and by what authority it was affixed ? Undoubtedly it may and it ought. Suppose amendments should be voted at a meeting of the corporation, not lawfully convened, and some of the members who were absent, should dissent. Suppose a meeting lawfully convened, and then the majority should force the minority to retire, after which they should pass a resolution for amendments. Suppose, by the constitution of the corporation, a certain quorum should bé required to do business, and a number less than the quorum should pass resolutions for amendment, and affix the seal. Or suppose the constitution provided that the assent of certain members should be necessary, and the others proceeded to act without their assent. In all these cases, it is too clear to admit of argument, that the Court would do flagrant injustice, if it suffered the seal to preclude an examination of the truth.
In the case before us, irregularities are complained of, and the power of the lay members to propose amendments,- altering the fundamental principles of the charter, against the will of the clergy, is denied. It will be necessary therefore, to analyse the charter, to consider the power possessed by the different members, and examine how that power has been exercised. But I will previously remark, that should the rights intended to be secured to any persons, by the charter under consideration, be affected by the proposed alteration, the Act of Assembly, by virtue of which we now sit in judgment, should be liberally construed for the protection of those persons. For the people of the United.'States, and of this Commonwealth in particular, have shewn a high regard *531 for chartered rights. One of the grievances set forth in our declaration of independence was, that the king .took away our charter, and in the case of ‘‘ The College, Academy, and Charity School of the city of Philadelphia,” the Legislaturé of Pennsylvania set a memorable example of good faith and integrity.. During the heat of the revolutionary war, the charter of the .college was prostrated by an Act of Assembly passed the 27th November, 1779, for an alleged breach of charter committed in the year 1764. It is worthy of observation, that the Legislature which passed this Act, was friendly to learning, and though it destroyed the college, erected in its place, a seminary founded on a larger plan and calculated to be more extensively useful, on which it conferred valuable endowments. Nevertheless, when the warmth which probably occasioned the destruction of the college, had-subsided, and the people had time to reflect calmly on'the injustice of taking away a charter, zvithout trial, the Act of 1779, so far as it affected the college, was repealed, with strong expressions of disapprobation.
To return to the charter'in question, which bears'daté the 13th September, 1788. It is to be observed that so long ago as the 23d January, 1760, the legal estate of the lot on.which St. Mary's Church now stands, was-vested in' JDaniel Szydn and others, in trust for the members in unity with the Roman Catholic congregation. This appears by the declaration of trust of Swan and others—and it is presumed that, this property has been legally vested .in the present corporation, (although no deed of conveyance appears to have been given in evidence,) because, it is mentioned in the' charter. Between the years 1763 and 1770, St. Mary's Church was built, and since the year 1.800,-it has been much enlarged. The expense of these buildings was defrayed by-individual subscriptions, and it is supposed that the ground vyas purchased in the same manner. It is in evidence also, that the clergy were not backward in contributing. The Act of Incorporation, after a recital that the members -of the religious society of Roman Catholics, inhabiting the city and vicinity of Philadelphia, and belonging to the congregadon worshipping at the church of - St. Mary, had requested the Legislature to pass a law to incorporate them, and enable them to manage the temporalities of. their church as. other religious societies *532 had been enabled to do, proceeds to incorporate them by the name of “ The trustees of the Roman Catholic Society, worshipping at the church of. St. Mary, in the city of Philadelphia,” and authorises the trustees to lease, sell, or otherwise dispose of, the real estate of the corporation, except the church called St. Mary's, and the lot of ground, grave yard and appurtenances thereto belonging. The Act then appoints three priests, (then pastors of the church,) and eight laymen, as the first trustees, and declares that the future trustees shall be and consist of “ the pastors of- the church for the time being, duly appointed, not exceeding three in number, and of eight lay-members, of the congregation worshipping at the said church, to be appointed and elected in the manner therein directed.”- The manner of appointing and electing is afterwards directed, as follows.
The lay members are to be chosen by ballot, and “ every member of the congregation holding a pew, or part of a pew in the church, and paying for the same not less than fifteen shillings by the year, and not being in arrears for the said contribution more than six months, is entitled to a vote.” The election is to be decided by a majority of the votes thus qualified. It is to be annual, and thé lay trustees thus chosen, are to continue to be trustees until the next election__ “ And if the pastors of the said church, duly appointed, shall, on any day of such election, exceed the number of three, they shall, among themselves, agree, which three of them shall be trustees for the ensuing year, and shall openly declare, in the presence of all the electors so met, at the time of concluding the said election, the names of all the said trustees and members, who shall be so appointed and chosen trustees of the said corporation, and their names shall'be entered on the books of the said corporation, for that purpose to be kept, and the said trustees so appointed, and members so chosen trustees as aforesaid, shall be and continue trustees until the-close of the next election.” These trustees and their successors, are to meet from time to time, and transact, the busiuess of the society, ‘‘ of the time and place of which meeting, due notice shail be-given to all the trustees, at least one day before, at which meeting the eldest pastor present-shall be president, and if seven of the said trustees shall attend, they shall form a quorum or board, and *533 shall have power, by a majority of voices present, to make, ordain, and establish such rules, orders and regulations for the management of the temporal business, the’ government of their schools, and disposing of the estate of the said corporation, as to them shall seem proper.”
This is the substance of the charter—Let us now see what proceedings have been had, in order to procure the proposed alteration. , '
The election of the present trustees .took place on the 24th of April, 1821. At that time there appear.to have been • three pastors ; the Right Rev. Bishop Conwell, and the Rev. Mr. Cummiskey, and Mr. Hayden. The board met the day after the election, present the three pastprs before mentioned and all the eight lay members. The Rev. Mr. Cummiskey was declared Presidént and took the chair. At that meeting the lay'members entered a protest against the appearance of the bishop, or of Mr. Hayden at the board, or their participating in the transaction of. business, for which they assigned their reasons. They add, “ that they do not intend to Oppose the continuance of the bishop or of the Rev. Mr. Hayden at their meeting, but they cannot consent to recognise either of them,» in any official character, or consider them entitled to exercise any of the functions or privileges of a member.”—It •does not appear that the bishop ever attended the sittings of the board after that meeting, but the Rev. Mr. Cummiskey, against whom no protest was entered, attended and presided at meetings held on the 25th, 26th, and 30th of April, and on the 3d and 8th of May, being the only pastor present. He was present too at a meeting on the 14tb of May, at which was- also present" Mr. Hogan, a Roman Catholic priest, whose faculties had been withdrawn by the bishop on the 12th of December, 1820, and had not.been restored to him, .
It is stated in the preamble of a resolution passed by the board, at a meeting on the 28th of May, that the Rev. Mr. Hogan “ had resumed his station as pastor of the church, and according to seniority took the chair, at the meeting on the 14th of May, and presided over the board, and the Rev. Mr. Cummiskey, having also attended that meeting, was placed in order, on the right hand of the president’s chair, but thought proper, during the sitting, to express his disapprobation and dissatisfaction at being superseded, and after- *534 wards fully confirmed the same hy absenting himself altogether from the board, although several meetings had been held, and had also absented himself from St. Mary’s Church, and neglected discharging his pastoral functions”—after this preamble it was resolved “that the Rev. Mr. Cummiskey cannot any longer be considered as a pastor of St. Mary’s Church, and consequently not a member of the board of trustees of said church, having voluntarily vacated his seat at the said board, and neglected and refused d.scharging his pastoral duties in the said church.” At this meeting no pastor was present, and Mr. Cummiskey, having been served with a copy of the resolution, never afterwards attended.
The resolution for making the alterations in the charter, which are now submitted to the Court, was passed at a meeting held the 9th of July, 1821, at which were present the Rev. Mr. Hogan, (and no other clergyman,) and seven lay members. Before this meeting Mr. Hogan had been excommunicated by the bishop. The counsel for the lay-trustees have denied the right of the bishop to excommunicate Mr. Hogan, or even to withdraw h'is faculties, without trial, and on this subject there was much learned argument on both sides. But I shall give no opinion on this point, because I think it unnecessary, and therefore improper, as Mr. Hogan is not personally before the Court, and especially as proceedings in nature of quo warranto have been commenced against him, to try the right by which he claims to exercise the office of a trustee of St. Mary’s Church. In my view of the case, it is immaterial whether Mr. Hogan was a lawful pastor or not, because even though he were, yet he was not the sole pastor: and if there were other pastors who were unlawfully excluded from the sittings of the board of trustees, by the lay-members, at the time when the resolution for the alteration of the charter was passed, their proceedings cannot be valid.
That there was such an unlawful exclusion of at least one pastor, (the Rev. Mr. Cummiskey,) I can have no doubt. As to the protest against the bishop and Mr. Hayden, it is contended that it was no exclusion, but only a denial of their rights to sit as trustees, to which they were not obliged to pay any regard. It is said, too, that there was no intention to exclude them forcibly, and it may be so. It must be con *535 fessed, however, that these gentlemen were placed in a very delicate situation. Considering the nature of their offices, decency forbad their entering into warm altercations with the laitv, and there are some expressions in the protest, (“ that J , . . . there was no intention to oppose their continuance at that meeting,”) which rendered it rather doubtful, what treatment they might expect, if they appeared at another meeting. I give no opinion on this part of the case, and shall confine my observation to the exclusion of Mr. Cummiskey only.
It was not denied, that he was a pastor duly appointed, as I think it was not asserted, that the lay members of this society had ever before exercised* or even claimed, the right of appointing or removing a pastor. When the charter speaks of pastors duly appointed, it refers to the rules and discipline of the Roman Catholic Church, Something was said, in the argument, of the danger of a foreign head of an American Church. But, our laws have expressed no apprehension of any such danger: and, if our Roman Catholic brethren do, in their conscience, believe, that the power of conferring, or of withdrawing the sacred rights of the clergy has been handed down, in sure succession from the holy Apostle St. Peter, to the present pontiff, Pius VII. the people of the "United States of America, have seen nothing in this belief, either criminal, or dangerous to civil liberty. Neither has it been remarked, that during our revolutionary struggle, or on any trying occasion since, the members of that church have been less patriotic than their fellow Christians of other denominations. Their priests, therefore, are entitled to, and will receive the same protection as other clergy. •
Questions, concerning the rights of the Presbyterian clergy, have several times come before this Court, particularly in the cases of M'Millan (in error,) v. Birch, 1 Bin. 178. and Riddle &c. v. Stephens, 2 Serg. & Rawle, 537. In the latter case, these were my expressions, and I adhere to them. —“Every church has a discipline of its own. It is necessary that it should be so, because, without rules and discipline, no body composed of numerous individuals, can be governed. But this discipline is confined to spiritual affairs. It operates on the mind and conscience, without pretending to temporal authority. No member of the church can be fined or imprisoned. But, be he minister or layman, he may be ad *536 .monished, reproved, and finally ejected from the society. So may he retire from it at his own free will. - Under these restrictions, religious discipline may do much good, without infringing civil liberty.” And in the same case, it .was the opinion of the Court, that, according to the laws of the Presbyterian Church, it was not in the-power of the congregation to remove their minister ; but that the Presbytery alone could do it with a right of appeal, first' to the Synod, and in the last resort, to the General Assembly.
From all the evidence which we have had,of the rules of the Roman Catholic Church, the lay members .cannot remove their pastor. How was it then, that Mr. Cummiskey ceased to be a pastor of St. Mary's Church, or by what authority did the lay-members'of the corporation declare, that he had forfeited his office of trustee, which belonged to him ex-officio, if he remained pastor Í The reason- assigned is, that, he had absented himself from the meetings of the corporation, and neglected his duty as pastor.-. For neglect of pastoral duty, they h'ad-no right to.condemn, or even to try him j and as to declining to attend a few meetings of the corporation, that surely could not amount to a forfeiture of his trusteeship. He was never called on to explain or justify his conduct—no.charge was exhibited against him-—he never resigned his office—but on the principle of an implied resignation, he was expelled from the board. In this proceeding, the respectable gentlemen who compose the lay part of the corporation, (and ,1 know that among .them there áre men truly respectable,) certainly went too far. In so important a businesses an alteration offundamental articles, not only has every member a right to be present, but every member should have explicit notice, that the subject of amendment V*ts to be acted on. I am decidedly of opinion, therefore,'that the resolution in favour of an alteration of this charter, passed in the absence of Mr. Cummiskey, was unlawful.
Here I might stop. But another question of much importance to the peace of this society, has been brought forward, and wishing sincerely fo'r its peace, I think .it my duty to give an opinion on it. Suppose the three pastors to be present, and a vote in favour of amendment to be carried, by the lay members who make a majority of the board, the pastors dissenting and protesting against it, would that be a case, in *537 which this Court ought to sanction the amendments ? In considering this question, I shall avoid all technical and nice distinctions, and endeavour to ascertain the real nature and intent of the charter. It is to be presumed that the Act of * . . Assembly, which incorporates this religious society, was drawn in conformity to their desire, and the structure of the corporation plainly shows, that the greatest harmony and confidence subsisted between the laity and their pastors. The laity were to elect eight members, to whom were to be added their pastors for the time being, not exceeding three in number, duly appointed; that is appointed according to the rules of the Roman Catholic Church. These eleven trustees were to meet together, with power to transact all 'the temporal business of the church, seven made a quorum, and all questions were to be decided by a majority of voices present. But it was provided, that the oldest pastor present should preside.
We have here, th'en, two distinct classes of people, each deriving its power from a source different from and independent of the other. The laity being by far the most numerous part of the society, were entitled to a majority in the corporation, and they had it. But the clergy, though fewer in number, were entrusted with a degree of power, which if prudently exerted, would always give them sufficient influence. No provision was made for an alteration of their charter, because no alteration was intended. It by no means follows, therefore, that a majority of the whole number of trustees can alter the charter, because a majority could manage the ordinary business of the society—and this will be more evident, when we consider the nature of one of the alterations now proposed, which is nothing less, than to strike the whole body of clergy out of the charter—to annihilate them. How can it be supposed, that any thing like this was in the contemplation of those persons who may be called the founders of this church ; those who purchased the ground and built the chapel ? Having taken such anxious care to place their pastors in a reputable situation in the body corporate, can it be imagined that they intended to leave it in the power of their successors to expel them ? And if it was not so intended, how can it now be done ?
I grant, that if the clergy had consented; if even a majori *538 ty of the clerical trustees had consented, there would be no good objection to the alteration. Because, although the charter does not provide for it, yet, in the nature of things, it must be supposed that all human institutions may in the course of time require alteration. And when the question for alteration comes on, there is no rule so convenient as to decide by a majority. That is the rule of the common law, applied to corporations—The civil law requires two thirds. I agree therefore, that in corporations where there is no distinction of classes, a majority of the whole corporation would be sufficient. But where there are different classes, the majority of each class should consent, before the charter can be altered.
I have mentioned before, that the Act of March, 1821, authorising this society to alter their charter, referred them to the Act of April, 1791, for the mode of doing it; and I have also said, that the Act of April, 1791, does not seém to have contemplated a difference of opinion in the corporation, with respect to the propriety of the alteration, because it has made no express provision for such a case. We must therefore act upon such principles' as best suit the nature of the case. Had it not been, that the clergy exist as a distinct body of men, in this corporation, I should be for certifying the opinion of the Court, in favour of the amendments or alterations, required by the majority, at a meeting regularly'convened. But as the case is, I think there should be a majority of both classes. I cannot believe that the Legislature would have acted on any other principle, or that it intended to vest this Court with power to act on any other principle. For the clergy have valuable rights secured by this charter, the right of taking part in the management of those funds, from which their support is derived. These are rights of which the law takes notice, and which the Courts are bound to protect. On these conditions was the charter prayed for, and accepted, and no one is authorised to say, that it would have been accepted on other conditions. The clergy and laity were both before the Legislature, and both were parties to the grant of incorporation.
But the laity have no cause for alarm, should no alteration of charter take place.—should the clergy be so imprudent as to throw unreasonable impediments in their way, they may *539 always put them down by a vote of 8 to 3. Such is the power of the lay members, that if exercised with prudence and moderation, it will ensure the accomplishment of all reasonable plans. But if matters are pushed to extremity, great difAcuities may arise. The lay part of this congregation is greatly divided, though the. majority appears to be with the present trustees. But if such measures should be taken, with regard to the employment of pastors, as are incompatible with the fundamental principles of the Roman Catholic Church, it may be a serious question what is to become of the real property of the corporation. From what has appeared to the Court, the ground cn which the chapel stands, is held in trust for a Roman Catholic congregation. The site of the old chapel, (which has been enlarged,) was conveyed to the Rev. Mr. Harding, in fee simple, in the year 1763, 11 for him to build and erect a chapel thereon,” (these are the expressions of the deed ;) whether there has been a formal conveyance from him or his heirs, to the corporation, I know not. It appears however that it was supposed to be held in trust for this society, because the charter provides that the trustees shall have no power to claim it. But the charter was granted to a religious society of Roman Catholics, and before the charter, the ground and chapel was held in trust for a religious society of Roman Catholics. Now if a majority of this congregation should insist on employing pastors, contrary to the rules of the church, and the minority should choose to persist in remaining strict Roman Catholics, in the sense of the word at the time of their incorporation, what is to become of the chapel and ground adjoining ? That is a momentous question, on which I have not formed an opinion —but I mention it, in order to shew this congregation, that there are cogent reasons for reconciliation. On both sides of their unfortunate division, are found men of the most respectable character, on both sides there probably have been faults, and with the exertion of that Christian charity, which is incumbent on both, there may yet be a re-union.. As my opinion on the matter of law submitted to the Court, is in favour of the pastors of this church, these reverend gentlemen may, perhaps, not think me going out of my way, when I offer a few words for their consideration. It is scarcely possible that the Roman Catholics of the United States of *540 America, should not imbibe some of that spirit of religious freedom which is diffused throughout the country. If those who govern that church, exercise their power with great m°derat’on > if they are not too forward in assuming the direction of temporal affairs ; if they consult the reasonable desires of the laity both in the appointment, and the removal of pastors, in all human probability they may long retain their dominion. But if things are carried with a high hand—if, trusting to the authority of the church, they disregard the wishes of their congregations, it is easy to foresee how the matter will end. That church possesses neither property nor temporal power in this country. The laity have both. In a struggle, therefore, between the two orders, the issue cannot be doubtful.
With respect to the proposed alterations of the charter, I am of opinion, that under the circumstances of the case, the Judges of this Court ought not to certify that they are lawful.
Gibson J.
—We all concur that the congregation can signify its assent to an alteration of the charter, only through the trustees, who, for that purpose, are the corporate organ of its will. This holds with peculiar force in regard to bodies which associated under and were incorporated pursuant to the Act of 1791, which directs that “it may be lawful for such corporations respectively to specify the improvements that may be desired.” Those associations must be taken to have been formed on all the conditions and limitations of the Act, which therefore, are to be considered as conditions and limitations of the agreement between the original associates : and it is always an implied article, that the act of the government of the corporation, if fairly obtained, shall be sufficient evidence of the assent of all to the alterations proposed, it is said, however, that the trustees of this congregation which was incorporated by a special Act before 1791, are its corporate organ only for the transaction of its ordinary business, and not for the expression of its will in regard to the alteration of a fundamental article of its constitution. I perceive no such restriction. In the preamble, it is said, the members of the congregation had desired to be incorporated “ to enable them to manage the temporalities of *541 the church as other religious societies within this State have been enabled to do and.the 4th section declares that it shall be lawful for the trustees to meet together to transact “ the business of the society under their care that is, as I under-. stand it, the temporal business, to which alone their authority extends ; but then it must mean all temporal business without distinction as to what is ordinary and what extraordinary; for alterations of the charter may be a necessary business, touching the interests of every corporation as nearly, and which require as much deliberation, as any that can arise. Now where no special provision is made by the charter, the whole are bound by the decision of a majority of the corporators present.
The power of assenting to amendments must rest somewhere ; and it can, no where, be so conveniently or safely deposited.as with the trustees, under the controlling influence of the congregation, exercised through the medium of an election. • There is one case, I admit, where the abuse of the right of representation, may be so gross as to induce this Court to reject the act of the trustees ; and that is, where the elective principle would either be entirely abolished, or so vitally impaired as- not to leave in the power of the congregation the means of redress by a change of trustees, in case the measure were contrary to'the will of a majority of the electors : as if the amendments should declare the offices of the existing trustees permanent. In the case before us, however, the character of the amendments is directly the reverse ; for the appointment of all the trustees is to be submitted to the .electors. This point, however, I consider as having been put at rest by the decision of this Court on the application of a majority of the congregation in July last; with respect to which it is not a little remarkable that the party which now demand the assent of the body of the congregation is precisely that which then required the act of the trustees, as the only corporate organ, of the will of the congregation.
The second question is, whether there has been a fair expression of the will of the corporation ? and that will depend on whether the meeting at which the amendments were adopted, was in all respects legal. '
' I do not view the clerical trustees as integral parts of the *542 government of the corporation; and consequently I am of opinion their absence would not, of itself, render the proceedings void. The pastors of the congregation to the number Qf three are virtute officii to be trustees : but they are to ' have no distinct existence as a body. They are not a separate part or organ performing a peculiar office in the government ; but their functions are in all respects the same as, and to be exercised in common with, those of the other trustees, all having equal rights and powers. This distinguishes the case from that of an ecclesiastical corporation of brothers and sisters, which is to be held to be incomplete, wherever all the brothers or the sisters happen to be dead. In a corporation of this mixed nature there is the same genuine difference between the functions of the males and of the females, which is found in the economy of every well regulated private family. Such a corporation is in fact nothing more than a family artificially constituted for purposes of devotion. In the corporation before us there is no distinction of classes ; except that the eldest pastor present at any meeting shall preside. But this was never intended to distinguish the capacity or privileges of the person entitled to it, any more than if it had been declared to belong to the eldest or tallest member present. It was a precautionary measure to prevent collision, and as a mark of courtesy, to give the clergy precedence over the laity; but it was, by no means^ intended to render their presence indispensable; such an intention would have been expressed in direct terms.
But what says the charter ? The eldest pastor present shall preside, and if seven of the said trustees shall attend, they shall form a quorum or board.” Now here is no distinction as to branches ; but any seven of the said trustees” are to be a quorum. If the clerical trustees are a separate branch, they ought necessarily to be present by a majority of their number: not a word, about which, is said in the charter. The direction that the eldest pastor present shall preside, is evidently applicable only to meetings where the pastors or some of them shall, in fact, attend; and it would have exhibited an unnecessary, and even an absurd, attention to precision, to have expressed this specially; for nothing is more evident than that if none of them attended, none could preside.
*543 Besides, it never could have been intended to put it in the power of the clerical trustees to suspend the operations of the corporation, by withdrawing themselves, perhaps at a season when the temporalities of the church most required attention ; or in case of vacancy of the congregation, to jeopardise its interests by reason of the corporation being incomplete as to parts which a foreign jurisdiction only, and not the congregation, could supply. The construction which declares the pastors to be an essential part of the corporation, at the same time, puts the congregation at their mercy: the majority of laymen in the board is rendered unavailing the mom-, nt the clerical members choose to retire : the .corporation can do no act even in the most pressing emergency : the church may fall into dilapidation, and the interests of the congregation go to ruin; and this state of things would continue, without a possibility of amendment, as long as the clerical members should hold out.
If therefore the clerical members absented themselves with-. out a direct inhibition of their presence, the meeting at which the amendments were adopted was legal; but if the members who met and acted had precluded them, or any of them, from attending, their proceedings were void. I have found, no case direct to the point; but independent of those where meetings have been declared illegal for want of notice to corporators who were entitled to have it, reason alone is sufficient to shew, that members who have been forcibly excluded, are not to be bound by acts to which they were not parties. The reason why the act of the majority is considered the act of all who actually were, or had an opportunity to be, present, is that the law presumes the assent of each individual to have been given to every act to which, he was a party; the act of the majority being the act of each.
But no such conclusion arises where one or more of those who ought to have been actors, have been forcibly excluded : the legal presumption of assent can never .take place where the party had no opportunity to assent. The fundamental principle of every association for the purposes of self-government is, that no one shall be bound except with his own consent expressed by himself or his representative ; but actual assent is immaterial, the assent of the majority being the assent of all: and this is not only constructively, but ac *544 tually true ; for that the will of the majority shall, in all cases, be taken for the will of the whole, is an implied, but essential, stipulation in every compact of the sort: so that the individual who becomes a member assents before hand, to all , , ,, , - , , . _ . measures that shall be sanctioned by a majority of voices. Thus we say we pay taxes, we render militia services, or we perform any of the onerous duties of a citizen, only with our own consent; and this is not th.e less true, though we perform them with a bad grace. I admit that where actual participation in the government of the country is wrongfully withheld from an individual, by refusing his vote at an election, he is nevertheless bound by the official acts of those who are. elected ; but that is because there is no superior superintending power to correct abuses from the very root; nor could there be, for the exigencies of society require that the business of government should not in the meantime stand still: the right of the citizen, must, therefore, yield to considerations of necessity. But as to inferior associations where there is a superintending power, it will inquire, where the question is between the corporation and the individual wronged, and not a third person, whether the conditions on which alone each pledged his assent to the acts of a majority, have been performed by those who require the redemption of the pledge ; for if they have not, the others, who gave their assent only on those conditions, are not bound.
One of these conditions is, that each shall have an equal right with all rhe rest to vote, to counsel, and to advise. Whenever, therefore, a member is deprived of any of these, the act of the majority is not his act, and consequently not the act of the corporation, which consists of all its members. Now the clerical trustees were Bishop Conwell, the Rev. Mr. Hayden, and the Rev. Mr. Cummiskey. It is altogether immaterial, therefore, whether the suspension of the Rev. Mr.' Hogan, (who was present at the meeting at which the amendments were adopted,) were valid or not. As to clerical members, the board was full without him ; but I would not consider his being at the meeting.and acting as a trustee, as alone sufficient to vitiate the proceedings, as there was a majority without his vote. The question is, were the clerical trustees debarred from the exercise of their corporate rights ? I cannot view the protest against the right of the *545 bishop or Mr. flay den as an exclusion. It contained no direct inhibition; but, on the contrary, an express tion that their continuance at the meeting, and participation in its business, would not be opposed. The protest then was an assent to their continuing to exercise the functions of trustees subject to all legal exceptions : it was a saving of'all objections to their right in case the* lay corporators should afterwards think proper to contest it: it was to .avoid, an inference of acquiescence, which might otherwise possibly have been drawn from silence. The proceeding may have been indelicate, and sufficient to induce a gentleiqan of nice feelings to withdraw; but we áre not to decide the causé on the rules of good breeding. I am of opinion, it is necessary ,that there should have been a direct ouster.
■ Neither do I view the restoration of the Rev. Mr. Hogan to the active duties of a pastor,, as- such an exclusion of the others as can be recognised by this Court. If, in consequence of that act of the corporation, the clerical trustees thought themselves bound, (as they say they did,) by the discipline of the Catholic Church, to abstain from all interference in the concerns of the congregation, whether temporal or Spiritual, it was a matter that rested with their own consciences; We are not here on points of faith or the dogmas of any particular sect. This corporation is essentially and exclusively lay in its constitution'; and although a portion of its trustees are clergymen, it has no jurisdiction of spiritual things, being incorporated exclusively for purposes of civil administration. It is not éveh mixed ; for although three of the . trustees are clerks, it is riot’so much the char racter of the corporators, as the nature of the objects to be accomplished, which determines the character of the corporation. What this corporation, then, has to do with, is the temporal business of the congregation : its-spiritual concerns belong to the dignitaries of the church, another, and a distinct branch of its government; and to that, áll questions of disabilities for conscience sake, must be referred. It is sufficient therefore that the restoration of Mr. Hogan presented no actual obstruction ; and if the pastors -withdrew in coni sequence of it, their absence is to be considered as having been voluntary.
But as regards Mr. Cummiskey, there was á direct exclu *546 sion. If the lay members had the right to expel, the reason they agsjgn for his amotion, is bad. An expression of dissatisfaction at a particular measure of the corporation and a suPPosed confirmation of such expression, by withdrawing for several meetings, are no ground for expulsion under the charter, or any bye-law which has been shewn. As therefore the amendments were adopted at one of these, I am of opinion, that the application should be denied on that ground.
The illegal amotion of this trustee was a violation not merely of his own rights as a corporator, but also of those of every corporator whom he represented j and as each trustee, whether, constituted by the clergy or laity, is the representative of every member of the corporation, it cannot be said that the corporators were fully or fairly represented at any of the meetings subsequent to Mr. Cummiskey’s expulsion : consequently these meetings were illegal.
There is, however, another question on which it is proper to express an opinion, and with respect to which, I regret the sentiments of my brethren, and those I entertain, do not coincide : Are the proposed amendments lawful?
Here it is proper to premise that-it is evidently unfair to treat this question as if we had succeeded to the power of the Legislature over the subject. We have no power to incorporate or grant amendments. By the Act of 1791, that is vested in the association or corporation itself. All that is referred to us, is to say whether the objects, articles and conditions of the instrument submitted to us, are lawful and in this we exercise no other or greater power than what must have been previously exercised by the Attorney General. All considerations of a mere discretionary nature, as to the policy or the propriety of the amendments must therefore be discarded. The mere line of abstract lawfulness, it may be difficult to ascertain ; but when once actually ascertained, it must govern.
In judging of the lawfulness of articles or amendments, it was not, I admit, the intention of the Legislature, to confine us to a consideration of .what should directly appear on the face of the instrument, without reference to extrinsic circumstances. We have already acted on this principle by refusing to certify in favour of associations of married women, because they might involve their husbands’ rights in *547 their own corporate responsibilities. In the case before us, the objection to the amendments is urged on the ground Qf their being supposed to impinge? on interests secured by the charter. The inquiry will be, would the Legislature itself, by an express statute made -with assent of the corporation, have power to alter the charter in the points proposed ? For if it would, it is clear, the same power in its full extent, is transferred to associations and corporations subject, as this is, to the Act of 1791. The Legislature, wearied with the frequency of applications for acts of incorporation, pass a general law vesting in all associations for literary, charitable, or religious purposes the power of self-incorporation, and of adopting amendments to the charters thus created, without any restriction, except as to the lawfulness of the objects, articles, and conditions of the charter to be established, or the amendments to be procured. There is, therefore, in all other respects, a transfer of the whole power of the Legislature over the subject. If there is not, where shall we draw-' the line of restriction? But I admit that the Act of 1791, which is an enabling, not a disabling, statute, was never intended to trench on chartered privileges ; nor would it here, for we have the assent of the corporation to the amendments ; and this distinguishes the case from that of Dartmouth College v. Woodward, 4 Wheaton, which I however take to be a strong authority in favour of the doctrine I advocate. All that was decided there was, chat the college should not undergo a violent transformation at the mere will of the Legislature ; but it was not supposed by any one, that, if the assent of the corporation had been procured, the Act of Assembly would have been unconstitutional. In the case before us, the amendments' are proposed by a body uniting in its own person all the power of the Legislature over the subject, and all the rights of the corporation. If therefore there are interests secured by the charter, they must exist in individuals who are third persons; and these are supposed to be :—First, The original contributors and donors, or. their representatives : Second, The clerical trustees. Of these I shall speak in their order.
The congregation has undoubtedly received large donations from individuals ; but whether before or since it was incorporated, is by no means material to the argument. If *548 received before, the gift was absolute : at least the permanency of corporate provisions could not have. been an implied condition, for there were none. ■
jf received since, the gift was either absolute or conditional, and if the former, there is an end of the argument. But if it were conditional, the donor or his representative might resume it, in case the proposed amendments should work a forfeiture, and this would be their only redress ; for it can never be endured that a conditional gift of ten dollars shall arrest the progress of improvement in the civil administration of a congregation which has other property involved, perhaps to the value of a thousand times that sum. Bat if it were given without condition, its future application was confided to the discretion of the donee, who is, to that end, the representative of the donor. In the Dartmouth College‘Case it is supposed by Mr. Justice Story that there is “ an implied contract between the corporation itself, and every benefactor, that it would administer his bounty according to the terms and for the objects stipulated in the'charter.’* 4 Wheaton, 689. But it is evident that every donation where there is no condition expressly reserved, is rather on a trust or confidence that the thing given shall be faithfully applied to the general objects of the institution according to the reasonable discretion of the trustee, who must necessarily judge of the mode. I think this is fully supported by the opinion of Chief Justice Marshall in the same case,, where, with clearness of perception and strength of expression for which he is conspicuous, he says : “The consideration for which they stipulated is the perpetual application of the fund to its object, in the mode prescribed by themselves. Their descendants may take no interest in the preservation of this consideration ; but in this respect their descendants are not their representatives: they are represented by the corporation. The corporation is the assignee of their rights, stands in their ptace, and distributes their bounty as they would themselves have distributed it, had they been immortal.” lb. 642. The truth is, there must be a discretionary power somewhere, to vary the application of the fund according to the ever varying exigencies of times and circumstances. It is contrary, to the spirit of our laws to permit an individual to direct the descent of his property, or to tie up the particular mode of *549 its application to specific objects for an indefinite period after his death. There may be cases where it is fair to suppose a founder or large contributor had fundamental objects or leading principles of application in view ; and on a question of amendment before the Legislature, which may interfere or not at pleasure, the consistency of such objects or principles, with the amendments sought, should have weight, and in some cases sufficient to turn the scale. But the discretionary power of the Legislature is transmitted along with the power of self-incorporation to every association subject to the provisions of the Act of 1791, which thus becomes the exclusive judge of the propriety of its exercise. The peculiar confidence between the donor and the donee, being of a nature which precludes its being taken cognisance of by a tribunal which disclaims all arbitrary discretion and.professes to act according to fixed rules, cannot be enforced here t what we have to do with, is the lawfulness, not the propriety, of the amendments. But whatever may be the designs of the party who propose them, (and we cannot discover them from the amendments themselves, whatever we may have heard out of doors,) these supposed stipulations of the original members, received no sanction from the charter. The con^ gregation was incorporated notin its ecclesiastical, but its lay aspect. That it should continue to hold the tenets, or be subject to the discipline of the church of Rome, was no condition of the charter, express or implied. A congregation of any other sect, could have had a charter as readily as this. Stipulations for forms of doctrine or points of faith, were matters' to which the Legislature was not a party, and with which it had nothing to do. This congregation was incorporated, like every other, to enable it to manage its temporal concerns to the best advantage. The establishing of a particular set of religious opinions by law, is contrary to the genius, not only of our government, but of the age in which we live.
But if the Legislature were originally a party, it is a party still, and may wave all conditions reserved, as far as they depend on its consent: and it appears to me it has expressly waved them by passing the special Act which subjects this corporation to the provisions of the Act of 1791. The assent of the corporation to the amendments, is the assent of *550 the Legislature, and a waver of all previous conditions. But I cannot discover how the proposed amendments would conflict with those conditions.
I understand that none of the amendments, but that which proposes to abolish the right of the pastors to be trustees ex officio, is regarded as a violation of chartered rights. Now take it that the original contributors, or the donors since the charter, were staunch Catholics, and that their donations were made under a supposition, and with the intent, that the congregation should continue subject to the discipline of the church of Rome: does the management of its temporalities by trustees exclusively lay, and appointed by the congregation, militate against those objects ? Their donations were not to the church, but to this particular congregation ; and it is, therefore, by no means necessary that the church should be represented, by a part of its body, in the management and application of them.
I conclude then, that-a regard for any supposed objects of the contributors ought not to defeat the amendments : because we do not know that those objects were conditions of their grants ; because if they were, a discretionary power over such conditions must be considered as vested in the corporation ; because we do not know that the amendments interfere with those conditions ; and because such conditions were never recognised as a consideration for the charter, further than as an obligation resting in the conscience and discretion of the corporation.
I proceed to consider the interest which the clerical trustees are supposed to have in the question. I cannot discover in the Act of Incorporation, any intention to vest an interest in those gentlemen, which should not be subject to future disposition by the Legislature. The pastors of the congretion duly appointed, (which I admit means inducted according to the rules of the Catholic Church,) are, to the number of three, to be trustees virtute officii; and it is said this is a fundamental article of the association: be it so. But is not every article of a charter, (which is the constitution of the corporation,) fundamental ? Every application to amend, is an application to change a fundamental law. As long as such law is suffered to exist, all the interests secured by it, are to be held sacred: but I know of no implied condition of *551 association, by which the creating power is to be restrained from changing the original articles. This corporation by the special Act of 1821, subjecting it to the provisions of the general Act of 1791, has succeeded to all the power of the Legislature over the subject of amendments ; and I think I have shewn that all implied stipulations between individuals and the body about to be formed, rest merely in conscience, and cannot be enforced by the civil authority.
But what is the nature of the personal interest which the pastors are supposed to have under the charter? It cannot be an interest in the property of the corporation. They are not, as has been argued, joint tenants, or tenants in common, of the legal estate : that does not rest in them as individuals, but in an invisible, intactiblé, and incorporeal being, the corporation. There is no survivorship among them ; neither is their interest transmissible to their.heirs. They have no personal interest of a beneficiary nature under the corporation as a trustee. The corporation is seised in trust for the members of the congregation, but the pastors, as such, are not members of the congregation. They stand in the relation of persons employed and paid by the congregation ; and paid out of a fund to which they are not bound to contribute. They are men without families and represent no portion of the laity ; whatever is given by them is surely gratuitous. They are members of the congregation only by force of the Act of Incorporation, which invests them with office in its civil government. What interest they have, must therefore be in the ojfice of trustee.
This is a trust not coupled with an interest; for, as individuals, they have neither the legal nor the equitable estate. I do not insist on this as a matter of any importance $ for I admit that a fiduciary interest is as much under the protection of the law as if it were beneficiary. It is more important to consider the object of the trust. This the Legislature tell us in the preamble of the Act is, to enable the congregation “ to manage the temporalities of their church as other religious societies within this State have been enabled to do.” Surely an indefeasible right of office in a particular class of the corporators was unnecessary for that purpose. But who are these corporators ? The pastors for the time being, duly inducted, and not exceeding the number of three. *552 Now as St. Mary’s is the cathedral church of the diocess, the bishop is necessarily one; and he has beside the nomination of the other two, who hold their offices by no other tenure than bis pleasure. They are strictly tenants at sufferance ; for the instant their faculties, as pastors, are withdrawn by his sic volo, they cease to be trustees. He then has, in effect, three votes' out of eleven in the lay government of the congregation. This is no theoretic influence. We are told by a very respectable clergyman who was called by those who oppose the amendments, that “ they all are bound to follow him: he is their leader.” But the bishop himself holds his office on the same terms of unconditional submission to the papal see. He, at least, derives his authority from that source. Now from this, it is evident the pastors are not the parties in interest at all. It certainly cannot be pretended, in any view, that they have a freehold in the office, or an indefeasible interest of any kind. When more than three have been inducted, they all, (as well those who are trustees for the time, being, as those who are not,) select from among themselves the three who are to be trustees for the ensuing year. It is the franchise of the Catholic Church, not of the individual; and the head of the church therefore is the real party in interest. Here then is a foreign jurisdiction, in its nature political as well as ecclesiastical, holding and exercising the power of appointing to an office, created by the government of Pennsylvania, for purposes entirely civil and domestic. Can it be said that the Legislature has so far divested itself of power over the subject, as to be unable to resume the right of the appointment, and to place it elsewhere ? Far be it from me to counsel the Catholics of this country to shake off their spiritual allegiance to the pope : that is their concern, not minej but I do protest against a right of appointment to a civil office, incautiously granted to a foreign potentate, being held irrevocable by the laws of our own country. With me it is of no consideration that the Catholic bishop is elected by the Catholic clergy, here or elsewhere : both he and they acknowledge the. see of Rome, as the source of all their authority, and the supreme power to which they are responsible. It is enough that our citizens here, whose rights are involved in the government of the corporation, have no voice in no *553 sninating or rejecting the pastors who are to sit over them. Will it be said that the annexing of the office of trustee to the office of pastor, as an incident of accessory of the latter, is a direct and personal grant of corporate office, to the clergyman who ,may be in the actual discharge of the pastoral duties? It was never so intended. This union of office was created for temporary purposes of convenience ; not to vest a permanent interest in individuals or any ecelesiasticai body; and. when purposes of convenience will be promoted by the measure, it may be dissolved by the same power which created it, or by those to whom that power has delegated its authority. In this view, neither the authorities of the church, nor the pastors as individuals, have ground for complaint. By depriving the principal of its accessory, the right of the pope, the bishop, or the individual pastors, which never extended beyond the principal, are left untouched, and precisely as they existed before the union of these two offices. But even should the provisions of the charter amount to a constructive grant of the right of appointment to a foreign potentate, Í would hold the grant void on the ground of surprise. It never was the actual intention to pass such a right; but only to point out a mode of selecting a portion of the trustees, which might be changed as circumstances should require.
I am therefore of opinion, that the amendments are lawful: and that if they had been adopted at a meeting at which all the. trustees were either present, or had an opportunity to be so, we ought-to grant the usual certificate. ■ I have not inquired into the regularity of the meeting in other respects, as no objection has been made on any other grqund; my objection' rests exclusively on the illegal expulsion of Mr. Cummiskey. ' ’
Dtjncan J
The application for the amendment of the articles of incorporation, of the members of the religious society 'of Roman Catholics, belonging t.o the congregation of St. Mary’s Church in the city of Philadelphia, is made under the corporate seal, and is supported by a majority of its members.
It is remonstrated ágaipst by its pastors, and* is opposed by a numerous body of its members, on the grounds—'Firs#, That it is not made by the members of the church. Second, *554 That it is not made by the corporation. Third, That one of the proposed amendménts is unlawful, and disfranchises the pastors of the church, an integral and distinct part of the corporation.
The exercise of the authority of this Court to grant and amend charters, is not the usual exercise of a judicial function :—it is untried ground, and from the discussion of this question, delicate ground. When an application was made for a charter, the Legislature supposed that there would be no diversity of opinion among the associators, and have limited the inquiry of the Court, to the la wfulness of the objects, articles and conditions of the proposed charter, and in like manner to the lawfulness of the improvements, amendments, or articles afterwards desired. The difficulties in the exercise of this special authority are not few. They were not foreseen, and are not provided for. But they are increased in the cases of proposed alterations. Should the application for amendment be by a corporate Act, and every member of the society, but those of the corporation, remonstrate against it, is the Court bound to grant it? Could they exercise a discretion, when a bare majority of the members are in favour of it ? Ought they to grant it, when the corporation consists of two integral parts, and one asks to exclude the other, who claims by a vested right—where one is lay, and the other ecclesiastical, holding by different tenures— one depending on annual elections by all the members of the church—the other by a permanent tenure—a permanent body-deriving their right under a different" authority, whose superiority all acknowledge—for all here acknowledge the bishop’s right to appoint a pastor, and by the Act of incorporation the pastor virtute officii is a trustee.
In the opinion delivered by the Chief Justice, on a former occasion, there is a strong intimation, that where the corporation cOmes before the Court for an alteration, to which the assent of the society has not been obtained, on affidavit of the facts, a remedy might be found, by which the rights of •the society might b.e protected—(minorities likewise have their rights,) and I know not of any other than denying the amendment. . It is the province, of a Judge to decide, and not to advise ; but every virtuous citizen, to whatever religious society he may belong, must desire, anxiously desire *555 to see peace restored to this very respectable, but miserably distracted.church. It is to be regretted that in these church differences, and I do not confine it'to this, church, the observation extends to all—we do not always find that meekness, and charity and forgiveness, and humility and forbearance, and hearing with each other’s infirmities, required by the Divine' Author of our religion—that which .begins in conscience and sincerity, as the contest waxes warm, becomes one of spirit, of passion, and of pride.
Pride and passion will always beget error. For my own part, without intending offence, I see in this transaction much of error on both sides : something to undo, steps to be retraced, mutual forgiveness to ask, and to receive. Accusations are made; recriminations follow, until the parties lose sight of the matter in controversy and of each others real character—a little spark which a drop of water would have quenched, one breath of kindness blown out—which had it been let alone, would have gone out itself, has been fanned into a fierce flame by an immediate and vigorous exercise of power, not opportunely, perhaps not very temperately exercised-on the one side, and a proud defiance on the other.
It would be well for both parties to. pause and weigh the consequences, not only to this particular' church, but to the Roman Catholic Church in this country generally, to whose doctrines and discipline both profess an adherence—it would be happy indeed for themselves, and all good men would rejoice in it, if by. a mutual sacrifice of petty resentments, peace were re-establis.hed—for whatever may be the result of this application, there will be little room for triumph. The victor? may find it a most disastrous victory, and find in the end, they' cannot subsist without the aid of those'who, though defeated, are-not vanquished, and laid prostrate-at their feet, and that the church can never prosper but by a union; A house divided against itself cannot stand. By withdrawing or stinting the stipends, the laj: members may starve out the stoutest priest,- or most abstemious and mortified prelate, though they have no power to appoint or remove them; for here there are no benefices, no church establishments of the State, no tithes or seigniories, or domains assigned for the support of the clergy--they, depend on the voluntary contri *556 buttons of the people, and while the people hold the purse, treating the clergy with all liberality, respect and reverence, this will effectually check all oppressive exercise of the legitimate power of the church, and render fruitless every attempt to infringe on their civil rights.
I have conscientiously applied my understanding to the question of the parties’ legal temporal rights, divesting my mind of what have been called in the argument protestant prejudices, for nothing of that kind should mingle in deciding questions of mere right. If I had any, I am not indulging, but deciding against them. The constitution of our country has wisely and justly secured to every man the natural and indefeasible right to worship Almighty God, according to the dictates of his own conscience. And this Court disclaims all jurisdiction in questions of dogmatical theology and polemic divinity ; for if they did exercise it, they would be at a loss to find legal principles on which to decide. Yet in deciding on the temporal rights of any religious society, it becomes their duty to inquire into the articles of their government and discipline; for no society can exist without some government, give it what name you please, call it ecclesiastical council, convocation, presbytery, synod, general assembly,—some claiming the right to govern the church jure divino, or by apostolical institutions, and others with more humble pretensions claiming spiritual authority from things merely human—each-has a discipline and church government of its own, some platform, but this is confined to spiritual matters and exercised pro salute anima.
This is a principle well settled in this Court. On a writ of error from the Common Pleas of Huntingdon county, Riddle et al. v. Stephens, 2 Serg. & Rawle, 542, it is stated with-great clearness and strength by the Chief Justice. The demand of the plaintiff below, Stephens, was for services rendered the defendants as their pastor. The Chief Justice observed, “ the presbytery, according to the rules and discipline of the Presbyterian Church, had power to suspend the functions of the plaintiff, or even to remove him from his ministry ; so far as respected his suspension or removal, the jury were directed to consider the proceedings as evidence, but no regard was to be paid to the details of evidence be *557 fore the presbytery; the particular facts alleged or’proved were to have no effect on the verdict. The decision of the presbytery as to the suspension, or removal of the plaintiff, was the only matter to be regarded. ,, , , , . . .
,, , , , “ Every church has a discipline of its own—-it is necessary that it should be so, because without rules and discipline, no body composed of numerous individuals, can be governed. But this discipline is confined to spiritual affairs, it operates on the mind and conscience, without pretending to temporal authority. No member of the church can be fined or imprisoned, but be he layman or minister, he may be admonished, reproved, and finally ejected from the society. So he may retire from it at his own free will. .Under these restrictions, religious discipline may produce much good, without infringing on civil liberty. Both plaintiff and defendants were subject to the laws of the church, both as to the induction and' removal of the plaintiff; it was not in the power of the defendants alone to remove the plaintiff—the presbytery alone could do it with a right of appeal to the synod, and in the last place to the general assembly. This being the case, it was to no purpose to enter into the plaintiff’s conduct before the jury; the cause had been heard and decided by the presbytery, and so far as regarded the plaintiff’s continuance in the ministry, the decision is binding, subject to appeal.”
The independent churches of New England, fleeing as their founders did from the rod of the hierarchy, and seeking that religious freedom in the wilds of this country, which the mother country denied, yet found it necessary to form some system of church discipline, and as early as 1648, formed one called the Cambridge Platform.—a council of other churches is made necessary for the removal of a minister. The minister does not hold his office at the will of the people, but in case of any difference between them, a neutral ecclesiastical council may be convoked at the prayer of either party. The decision is called the result, it is given by way of advice, and does not bind the party rejecting it. But still in Courts of law it is considered a justification of the party who should adopt it. Avery v. Inhabitants of Tyringham, 3 Mass. 160, and Burr. v. Inhabitants of Sandwich, 9 Mass. 277. And in England, the discipline of religious societies *558 dissenting from the established church is recognised; forthe entl.y jn books of the Society of Friends, of the expulsion of a female Friend, being a matter of discipline, was consi^ered by the Court as not libellous. The King v. Hart, 1 Black. Rep. 386.
On the first question the Court gave an opinion on a former occasion to which I adhere, that the application for amendments must come from the corporation—it must be a corporate act. But this does not prove that the Court is precluded from inquiring into the whole matter, or bound to grant a fundamental alteration, either altering .the qualifica.tions of the electors, or those that are eligible, against the remonstrance of a majority of the members, or a great body of the members, although in an.original charter this might be lawful: for then a corporate body might so modify the charter as to keep themselves in power forever. Besides, there would be no end to these changes, and every year there-might be some new bone of contention, and charters, which should be fixed and stable, would vary as caprice or passion would direct, and of these varieties and changes of constitution, as is said of making books, there would be no end. I do not speak of the alteration of mere regulations in the charter, which, experience had proved to be incorrect or impracticable, but a radical change of the body politic. It would be prudent in every charter, to insert a clause providing for amendments, and the manner in which the application is to be made—and by whom, and how the sense of the members, and the approbation of the proposed amendments, are to be signified. Such provision as is contained in the constitution of the United States.
There is a wide difference between the grant of an original charter and a radical change. Those provisions in their nature formal, and those altering the general constitution of the trust itself, are quite different things. The members of any religious society, will find no little difficulty in halting between two opinions ; it is pretty much the discipline of all churches, to declare that he who is not for them is against them—that a man cannot serve two masters ; and pretty much the practice to cut off diseased and condemned members, lest they should corrupt the whole body. I cannot bring myself to the opinion, that there is a power vested in this Court, *559 on the application of the corporation, under the name of amendments, to change the body corporate, and to transfer the estates of a private association, and the right of managing, regulating and disposing of then), to other classes of men, than the associators and the charter vested in it.
But is‘this application made by the corporation? Is it a legal corporate Act ? The seal may authenticate the Act, but is no more than prima facie evidence of the legality of the meeting. In considering the second and third objections, it is important to give a character to the corporation. That it is a private corporation, an elemosynary private institution, cannot be doubted. It is not a public corporation, for that is only such, where the government has the sole right, as the trustee of the public interest, to regulate, control, and direct the corporation, and its funds and franchises—one created for public purposes. This is a private association and institution—the giving it a charter does not make it a public one; the charter cannot make a charity more or less public, but only more permanent than it would otherwise be; it is the extensiveness which constitutes a public charity. Attorney General v. Pearce, 2 Atk. 85. It continues what it originally was, a private religious charity, founded on private donations, supported by them, and unendowed hy the State, and if it were not such an institution, there is an end to the dispute ; for this Court have no power to grant, or to amend the charter of a public institution created for public purposes. The jurisdiction vested in them is confined by the Act of 6th April, 1791, to private associations for charitable or religious purposes.
The title of the Act, the preamble and enactments, all prove this. It is entitled “ An Act to confer on certain associations of citizens of'this Commonwealth, the powers and immunities of corporations or bodies politic in law.” The preamble recites that a great portion of the time of the legislature had heretofore been employed in enacting laws to incorporate associations, and it would not only be more advantageous to the public, but also convenient to individuals who are desirous of being so incorporated, See. The Act incorporating this society was a private act, which must have been pleaded, and of which the Courts are not bound to take judicial notice without plea ; it is rather a private conveyance *560 than a solemn act of legislation. 2 Bl. 346. . In passing a private bill, nothing is done without the consent expressly given, of all parties in being and capable of consent, that have the remotest interest in the matter, unless the consent shall appear to.be. perversely and without any reason withheld, and in every bill of this kind, the rights of alb persons except those whose consent is given or purchased, are saved. These bills have been relieved against when obtained on false or fraudulent suggestions, and they have been held to be void if contrary to law and reason. Ibid and 4 Rep. 12. It is then a private conveyance by the donors and the state in trust for the members of this 'society. All the members are incorporated, and the estate of the donors and the management of that estate and the temporalities of-the society, by their common consent, testified by the acceptance of the grant ratified by the State, is,vested in the first instance in three pastors by name, and in' eight lay men by name; and in providing for a succession, of the sanie orders, .lay and. ecclesiastical; the same numbers, three clerical and eight Jay members, are preserved and intended to be preserved for ever. This was a compact; the parties , to which were the contributors, the members of the church (all of whom had most probably contributed something) and the State. ■ ■ <
The object (to me it is as clear as light can make any thing,) wás to give the pastors,a participation in the management of the estate and the funds, and to render the clergy and the laity in this particular independent of each other. It is a kind of. mixed corporation, partly lay and partly ecclesiastical, each having a voice in áll corporate acts. Of corporations some are spiritual; some, temporal, some consist wholly of persons spiritual and secular, ana some of persons temporal only, and some mixed of' persons ecclesiastical and .temporal. 6 Vin. 256. In 1 Rollers Abr. 515. Tit. Corporation, it is said, that if a corporation be constituted of brothers and sisters and all the sisters die, this is no perfect corporation.
Of this last class is the corporation of St. Mary’s Church, temporal, but of mixed persons, lay and clerical members. The object is clearly expressed: 1.'The pastors are permanent trusteés, the lay members fluctuating. They derive their rights and their franchises from different sources. The lay members from laymen, the ecclesiastics from a spiritual *561 Stead. 2. The ecclesiastics are constituted ex nomine by the name of pastors ; they hold virtute ojjicii: so.far is the separation kept up between them and the laity, that it is provided, that if the number of pastors exceed three, they shall choose among themselves three for the ensuing year;—and 3d. The head of the body in all corporate meetings must be a pastor —there is no charter day, but there is no provision for a meeting without this head. When legally assembled, the majority of voices govern; but every integral part must be present at a corporate assembly, by a majority at least of its proper members, thotigh the major part of all present, when assembled, are competent to do d corporate act. A charter required the presence of a mayor at all corporate acts ; the corporators were assembled, and a matter being proposed, the mayor dissolved the assembly, but the major part of the corporation continued .together, and proceeded; it was objected that such after proceedings were irregular. But the Court said it was very true that no new business can be proposed in. the absence of such officer, but the assembly always has a right to proceed in the business which was begun in his presence. Barnard. K. B. 386. The King v. Norris.
The evidence is very full, that the bishop, St. Mary’s being his Cathedral, was one of its pastors; the Rev. Messrs. Cummiskey and Hayden were pastors ; and the history of the exclusion of those gentlemen from participating in any corporate transactions, is.an'account of a most injudicious measure, unwarranted by the charter.
The protest against the bishop and the Rev. Mr. Hayden looked so much like exclusion, that I cannot find any other name for it; it is a declaration against their appearance at the board, and participating in its affairs on the ground that they ■were intruders and not trustees. The permission to remain in the room was an exclusion of any other privilege—it had the effect of exclusion; they withdrew. Aprotest of a minority against an act done by a majority we all understand; but a protest by a majority, that the minority have no right to seats, and shall not appear in them, is not protestation, but mandate.
But the exclusion of the Rev. Mr. Oummiskey was a violation of all justice and of all right. The causes most fri *562 volous, and the expulsion most unjust. Removed without a summons, condemned without a hearing. It is under these auspices, and after the exclusion of all the clerical trustees, that this application is made. It is no justification of this improper measure, that it was only following the precedent set them by the bishop in his deprivation and excommunication of the Rev. Mr. Hogan; of this they bitterly complain, and not without the appearance of reason complain as an act of oppression and tyranny, and as being against the canons of the church. We cannot but notice that this is the fountain from which all those bitter waters have flowed—without giving any opinion as to the power of the bishop to suspend or deprive him, and the legality of its exercise, reserving that question for our consideration on the motion for a rule to shew cause why an information in the nature of quo warranto should not issue against that gentleman, strict justice and impartiality compel me to say, that from what has appeared in evidence, there was some degree of harshness in the manner in which it was exercised, and something of precipitancy in the excommunication, which may have driven the friends of this gentleman to these acts of extremity. But the lex talionis was not to be resorted to. It furnishes strong evidence of the value put on Mr. Hogan’s ministry by so large and respectable a body of his flock, in following his fortune, and their dissatisfaction at the removal of a beloved pastor, as they say, ad nutum episcopi.
Whether this suspension, deprivation and excommunication were according to the rules of the Roman Catholic Church will be considered and decided on the quo warranto motion. On it I express no opinion at present. I am of opinion, that these acts of irregular exclusion of the whole integral part of this corporate body from the meetings in which this subject was considered, and this application adopted by those who now ask not only that they shall be excluded, but their successors forever, is not a legal corporate act, which this Court ought to act upon, and that for this reason, the certificate of the amendments being lawful, ought not to be given by this Court. But I do not stop here, for stopping here might lead the applicants into error. My opinion is, that the proposed amendment, striking.out an integral part of the corporation, and substituting another class of men in their *563 stead, is not a lawful amendment—is not an amendment at all, but the grant of a new corporation and a new charter. Much that is properly referrible to this head I have anticipated in my observations on the first and second objec» tions.
What by the terms of the charter, are the temporal rights of these pastors ? They are joint tenants with the eight lay trustees of the whole legal estate of the society—.they are the assignees, and representatives of the founders, and each individual of them holds an individual vested right in the franchise, the right to which, by an action in his own name, he might assert, and maintain in a Court of Law. The act of the founders, and the Legislature will have vested this right in them, and these pastors have some real interest in the management of the estate, and funds of this institution. Here the lay members have attempted to deprive them of their stipends; but those members are not permanent; at some future day, the present majority might find themselves in the minority. Men’s opinions are not unchangeable, and who knows but at some future day, their presence, their representations and their votes might restore, and even add to them, On the former application, the corporation protested against these amendments, and who will undertake to say, what may be the event of some future election. The very measure that put them out at the last election, may agaiu restore them. Such changes are not without example in elections, on a larger scale, and will continue to be the case, so long as elections continue free, and the minds of men mutable. They have a power coupled with an interest.
But it is said, the clergy ought to have no concern with the temporalities of the church. In my private judgment I might agree to this. The answer is an easy and satisfactory one. It has pleased the donors, and the donors always are considered as the founders of the charity, to think and to act otherwise, and it has pleased the Legislature to confirm it. Cujus est dare, ejus est disponere, is a maxim of the law as well applicable to private individuals, as to associations. I do not know what will become of St. Mary's Church; what of the corporation. Deprived of the church, they could not be worshippers there. Who would have the right to the church ? Those claiming under the new or under the old *564 charter?—or neither of them, but the founders and their heirs ? 'j/hese matters ought to be considered by both parties. For it never can be—where the founders of a church have conveyed —as act ^ncorPorat*on here has done, to the Roman Catholics worshipping in it—that even a majority of the worshippers can say, all this is wrong—the clergy shall have nothing to do with this estate, or concern in its management—we-will manage it ourselves. Those who adhere to the old grant and charter of the founders, and of the State, might justly say, if you do not like the terms on which the grant was made, you may quit; but as for our house we will not desert it. He that gives the first possession is the founder of the charity. Jenk. 270. Pl.28. Fitzh. Grant. Pl. 5.
This church cannot long remain.in its present state. The right cannot be decided by the arm of flesh, or any spiritual arm, but by the invincible arm of the laws of theTand. So much for the estate itself. But the franchise is regarded in the law as a valuable thing independent of pecuniary benefit. The charter is á contract between the State, the founder, and the objects of the charity, all of (whom are bound by its terms. The contract on the part of the government is, that the property, with which the charity is endowed, shall be vested in a certain number of persons, and their successors designated by the founder, to subserve the purposes of the founder, and to be managed in a particular way. But if the alteration changes the character of the trustees, then they are not the same persons the grantors intended should be the managers. The same identical franchise that has been before granted to one, cannot be bestowed on another, for this would prejudice the former grant. 2 Blacks. 37. All immunities, offices, franchises, or other incorporeal rights, though they are not tangible property, yet are valuable in law. The owner has a legal estate in them and legal remedies to recover his rights. Mr. Cummiskey being unjustly removed, could obtain a writ .of mandamus, which is a civil action, to compel the trustees to restore him to his office.
All this doctrine of corporations and the rights of trustees is fully considered and established as I have stated it in the Supreme Court of the United States, Dartmouth College v. Woodward, 4 Wheaton. I cannot distinguish this from a case where all the trustees are removed and others substituí *565 ed, or where they are in by their own names or by their names of office. Should the clergy in St. Mary's Church get the upperhand and propose, as an amendment of the charter, an ex-elusion of all laymen—all would exclaim, this a most horrible usurpation. Every man would cry out, this is unlawful; not an amendment of the charter, but an infraction. Others may see a difference ; to me the principle is the same, though the proposition is wilder. But we need not go from home for information on the subject of charters. Our Legislature gives an example of this kind of altering charters, and a result. In the Act of 6th March, 1789,2 Dali. State Laws, 660, repealing that which divested the trustees of the College and Academy of Philadelphia of their franchise, and vested it in others, the trustees of the University of Pennsylvania, and deprived the faculty and teachers of their offices, and restored them to the former occupants, there is this strong Legislative declaration, that they had been deprived of. them without trial by jury, legal process, misuser, or forfeiture, and the estate and rights: of the corporation vested in a new corporation ; and it concludes with a protestation, that all this is repugnant to justice, a violation of the constitution, and dangerous in its precedent to the rights of all incorporated bodies and to their rights and franchises.
I can consider this charter in no other light than a contract which cannot be impaired—a settlement of estates by an assurance that cannot be broken; a grant of a franchise, of which the tenants cannot be deprived, but by a forfeiture of their rights by misuser or nonuser, and that forfeiture to arise on a conviction in some cause, on a hearing by some tribunal, a body whose jurisdiction the law acknowledges—a judicial judgment of forfeiture.
What the Legislature might do bylaw is not the question before us, nor do I give any opinion on it. All that is the present duty of the Court, is to certify whether the proposed amendments are lawful, in the way in which they come before us. My opinion is that they áre not; that there ¿s no power delegated to this Court to alter the conditions of a trust, or private charity, or change the persons appointed to manage it by the joint voice of the grantors and the State. I have only to observe that the collision between the trustees of the College and the University terminated in a junction, *566 redounding to the-honour of both, and to the prosperity of the institution, and to conclude with an exhortation to the members of this church- to follow their laudable example and 8° and do likewise. For the affairs*'of- this society cannot long remain in this state of unprofitable conflict, and it requires no spirit of prophecy to foretell, that if it is not terminated by an union, it must end in a separation.
Amendments rejectéd.