CaRuthbes, J.,
delivered the opinion of the court.
The leading questions in these cases are the same, differing only in details and mode of proceeding. We will consider them together, pointing out the differences so far as may be necessary. They all originated under the acts of 1851-2, authorizing county subscriptions of stock in certain railroads. In each ease, the constitutionality of those acts is brought in question. In the two first, the proceeding is by petition to the circuit court for writs of mandamus to compel the county courts and their chairman to perform the duties required of them in the statutes; and in the other, by bill in equity, filed by the tax-payers of White county, to enjoin the collection of the tax imposed.
In cases of so much importance, involving as these do, more than a million of dollars, and many millions more perhaps depending on the principles now to be settled in this State, it is gratifying to be able to announce that the court concur in every material proposition embraced in the record and the arguments. This is their unanimous opinion.
It is gratifying, also, to be able to say, that the cases have been argued on both sides with that ability and zeal which their great importance, the large amount involved, and the expectation of the community demand. *653 By this thorough examination and masterly argumentation, on the part of counsel, the court has been much aided in its deliberations, and feel greatly indebted to it for the satisfactory conclusions at which they have been able to arrive.
The high and vital powers claimed by the legislature for itself and the counties in these acts, are well calculated to excite the deepest anxiety and solicitude in the minds of the people. It is not surprising, then, nor is it to be deprecated while circumscribed by law, that much excitement has existed, and the powers of the government subjected to the strictest scrutiny and severest tests. This comports well with the genius of our people, and is not unfavorable to the stability of then- institutions. The people are, as they should ever be, jealous of doubtful, but most obedient to legitimate power. They will contest it as their fathers did, when unauthorized, or even dubious, by legal and orderly means, but submit to it cheerfully, hard as it may seem to them to operate in any particular instance, when declared in the mode prescribed in their system of government, to be within its prescribed limits. And it is most happy for the country that they are so deeply imbued with this law abiding spirit, as without it, anarchy and confusion would very soon supplant law and order in a popular .government like ours, where all men have to look to the law and not to the bayonet, for the protection and safety of their persons and property. Freemen are well aware that their only safety is in the sanctity of their own laws, and all defend, appeal to, and stand by them when settled, and as settled by the tribunals constituted for the purpose, except lawless mobs *654 and reckless malefactors. The suggestion, then, that mwj constihitional law, no matter how inexpedient or onerous, might be disobeyed or resisted by the people while in force, must be regarded as out of place and inapplicable. But if it were otherwise, it could not have the weight of a feather, with any one worthy of judicial position. These considerations may be mooted in the legislature, but not in the courts.
The people of this State met in convention, by their representatives, in 1831, for the purpose of forming a new constitution, or amending and altering the old one adopted in 1796, at the birth of the State. Not content silently to entrust the cause of internal improvements to the legislature under the ample powers devolved upon it for that, and all other purposes connected with their well being and prosperity, they expressly enjoined this duty upon that body in § 9 of the xi. Art. of that instrument, in these emphatic words: “A well regulated system of internal improvements is calculated to devel-ope the resources of the State, and promote the happiness and prosperity of her citizens; therefore, it ought to be encouraged by the general assembly.”
At the first session after the ratification of the constitution by the people in 1835, the turnpike system was adopted, by which the State was embarked in the cause to the extent of two-fifths of the stock necessary to build any road in which the citizens would subscribe and secure the other three-fifths. In 1837, the aid of the State was extended to one-half, to be paid, in both cases, by the issuance of her bonds. A bank of the State was created to constitute a part of the system, and to aid the cause of education, which was likewise made *655 a prominent object of tbe convention, as appears in § 10 of tlie same article. ' This, system of improvement .received a severe shock in thfe great revulsion of the commercial world, which occurred about the time it went into effect, and was arrested by the legislature in 1839. Roads enough, however, had been bnilt, or commenced, in the meantime, to -demonstrate their effects upon the prosperity of the counties and sections through which they passed. Provision was at the same time made to aid in the construction of certain railroads, which resulted in discouraging failures. From this time for several years, the spirit of internal improvement slumbered, and' the constitutional injunction remained unheeded until 1851, when the people became fully aroused again on this subject, by the spirit which actuated their convention and gave birth to the constitutional mandate copied above. A new era in the cause of improvement had, however, by this time, been ushered in, and its benefits fully tested by our sister States in the adoption of railroads for, or in addition to, turnpikes and canals.
This system had proved itself to be as much superior to the former, as that, was to the common dirt roads with their wooden causeways and melting embankments which had preceded it. It was discovered that wherever a good system of railroads had been adopted, prosperity had crowned the efforts of the people in • every branch of business, and comparative darkness and inertia seemed to be settling down upon every section in which it had been neglected. This contrast becoming stronger and more glaring every year, at length aroused the State pride, and waked up the slumbering *656 energies of our people to a sense of tlieir interest. This, in 1851, resulted in the election of a general assembly which made a hold movement to recover the ground which had been lost, and overtake, if possible, in their career of prosperity, those States by which Tennessee had been so far outstripped. Tier younger, as well as elder sisters, were looking back upon her in their rapid march, and jeering her supineness and apathy.
The acts now under consideration constitute a part of the system then adopted. It was provided that the bonds of the State should be loaned to the various companies then chartered,' to the extent of eight thousand dollars per mile, upon the procurement of stock sufficient from individuals and other sources, to complete the x’oads with that assistance. To this extent, the aid of the credit of the whole State was given. But it was thought reasonable that the particular counties through which such roads might pass, in consequence of the peculiar and local advantages to them in their property and business, in addition to, and above the general benefit to the whole people, should contribute as a local community, a sum commensurate with such extra benefit, to be determined by themselves. To carry out that view, which seemed to be reasonable and just, these acts were passed. The first provision, by which a debt to be paid by all the people of the State is created, is based upon the consideration that the benefits of the system will be diffused throughout the whole, and certainly all are interested in the prosperity of any part of a community. The second provision goes upon the very reasonable conclusion, that if *657 such improvements be a blessing, those who are nearest to them are the largest participants; that is, the benefits derived are, as a general rule, in proportion to the proximity to them. If this .be so, if the legislature were right in this conclusion, -it -is difficult to controvert, successfully, the justice and equity of this regulation, if it had the power, under the constitution, to make it. But we are not to be understood as intimating that we have any power to base our action upon the inexpediency, injustice, or impolicy of the enactments of that body, if they be not in conflict with the supreme law. And whether these acts are forbidden by that law, is a grave and important en-quiry, upon which we will now enter.
The -general statute passed January the 22nd, 1852, ch. .117, which is made applicable to all the counties of the State, and under which the counties of Sumner and White proceeded, is in substance, as follows: Sec. 1 makes it lawful for any county court, through their chairman, to subscribe for stock in any railroad which .may pass through its county, or be contiguous thereto. Sec. 2 forbids such subscription, until the approbation of a majority of “the legal voters of the county” is obtained, by an election to be ordered by said court, and to he held by the sheriff, after giving at least thirty days notice in writing, at all the places of holding elections in the county; “which advertisement shall specify the amount of stock proposed, and when payable.” “And if a majority of the votes polled be “for subscription,” the chairman of the county court si ah carry into effect the will of the majority, and shall subscribe the amount of said stock so voted for.” If *658 the vote be adverse, then the question is not again to be propounded within six months; and not then, without a concurrence of a majority of all the justices of such county. Sec. 3 makes it the duly of' the county court to order such election, upon the application, in writing, of a majority of the commissioners of such road; or, if organized, by the board.” “Said elections shall be held and conducted as the county court shall direct.” Sec. 1 provides that such monies shall be expended within the county, or as near thereto as practicable, if the charter and existing obligations of said company will permit. Sec. 5. That when such stock is taken, it shall be the duty of the county court to levy the necessary taxes for that special purpose. Sec. 6 makes provision for the collection of the tax. Sec. 7 prescribes the duty of the clerk in making out a tax list. Sec. 8 prohibits the collection of more than thirty-three and one-third per cent, of such subscription in^ any one year; requires it to be paid to the treasurer of the company as it may be collected; the collector to give the tax-payer a certificate of the amount paid by him, “which may be traded, assigned or transferred,” and “shall be receivable in payment of freight or passage” .on said road. Said certificate to be countersigned by the clerk of the county court, and shall entitle the holder to receive a certificate of stock in such road, and to become a stockholder when the amount of one or more shares may be presented. Sec. 9 provides that upon the subscription of the stock so voted by the people, the county court may appoint a proxy to represent it in all the proceedings of the board. Secs. 10 and 11 provide for settlements, &c., with- the tax collector, and *659 prescribe certain duties to the clerk. Sec. 12. If no railroad fund be in hand at the making of any unexpected call by the company, the county court is to issue “county -warrants” at interest, to the board, which shall be redeemed at the county treasury at such time as may be agreed upon. Sec. 13 extends the privileges of the act to incorporated cities and towns. Sec. 14. “Be it enacted, That the circuit courts of the State, shall have power to issue a writ of mcmdamus, to compel said county courts to carry into effect the provisions of this act, so far as is incumbent on said county courts so to do.” Sec. 15 fixes the fees of the collector and clerk, and requires the court to add to the amount of stock voted and subscribed, a sum sufficient to cover such expenses of collection.
The petitioner or relator is a corporate body, made so by an act of the legislature of Kentucky; and by an act of _ the general assembly of Tennessee of 1851, a right of way is granted to it through this State, so as to connect the cities of Louisville and Nashville, with sundry limitations and conditions, all of which have been accepted.
At the June Term, 1852, of Sumner county court, the board of said corporation, by its President, L. L. Shreve, petitioned said court in writing, to order a vote of the people on the question of subscribing $300,000 • of stock in said road, upon the terms prescribed by the act of assembly. The petition was granted, and the Court, consisting of three justices, only, present, made the order following: “ Ordered that the sheriff and his deputies shall advertise for at least thirty days, and open the polls for said legal voters, and hold an *660 election, upon Saturday the 24th. of July, 1852, at the various election grounds of the civil districts of Sumner county, submitting the following propositions to said legal voters, which shall be embraced in said advertisements, to-wit: That the county court of Sumner shall ' subscribe stock to the amount of $300,000, payable in five equal annual instalments, from the 1st day of January next, in the Louisville and Nashville Railroad Company, agreeably to the provisions of said act, upon the following conditions: That said railroad company shall permanently locate said railroad so as to make the town of Gallatin a point on the same, by the 1st day of September next. If said company shall fail to make said location by the 1st of September, 1852, and by writing notify the chairman of the county court of said location, then the county court shall subscribe the said sum of $300,000 of stock in the Nashville and Cincinnati Railroad Company. In either case of the subscription of said stock, the money so subscribed shall be expended in the county of Sumner agreeably to the act. The sheriff shall hold said election under the law governing elections for governor, members of Congress, and the general assembly.”
The list of voters was to be reported to the next' court, and if it appeared from the report to the sheriff that a majority was for subscription, the chairman was to subscribe for the stock according to the order. It appears from the minutes of the court, that a petition had also been made by the. commissioners of the Nashville and Cincinnati road, at the same time and of the ■same tenor of the other. Judges to hold the election ¡at each precinct were appointed by the court. The *661 certificate of the sheriff was produced to the quorum court at August Term, hy which it appeared that he had held the election as required' hy the- order of June Term, and that there were 1,128' affirmative, and 1,022 negative votes — -majority 108. The- conditions set forth in the order of the court of June- Term, were complied with hy the hoard of the Louisville and Nashville company, in the time required, and Gr'eorge A. Wyley, as chairman, made the subscription. All of which, with the correspondence, was reported to the August Term, and entered upon the minutes, and his action was ratified and confirmed by the court. The said "Wyley is then appointed proxy for- said county, to act for it in the hoard.
On the 80th of December, 1853, the Legislature passed a special amendatory act, to authorize the county of Sumner to issue her bonds, in payment of her subscription of $300,000, at not less than ten nor more than twenty years at six per cent, interest, provided the company would receive them in payment, and the people should vote for the change in the mode of' payment thus prescribed. In this event, it is made the- dirty of the chairman of the court to sign and deliver- the bonds. An election was ordered by the court, which resulted in a majority for the change. -,
Application was then made to the- chairman, James P. Taylor, for the bond's and refused’.. Thereupon this petition was filed in the circuit court for a mandamus against said chairman and the justices of the peace of Sumner county, commanding the former to issue the bonds, or that the county court be compelled to levy a tax to pay the subscription. Process was served on all *662 the justices. A minority of them answer, consenting to the prayer of the petition, and a majority concur with the chairman against it, and in the assignment of causes against the issuance of the writ of mandamus. The writ was awarded by his honor, the circuit judge, and an appeal in error to this court.
The first and most prominent in the order in which we will consider them, is, that the said acts of 1852 and 1853 are unconstitutional. N
1. Because they delegate a power involving taxation to the counties for an object not local. Whatever doubts may exist upon the abstract question of the authority of the law-making department, to delegate any portion of its power to the subordinate civil divisions of the State, or town corporations, sueh doubts cannot arise here because this authority is expressly given in our constitution in specified cases, as to local matters generally. By art. 11, § 8, the Legislature “ have a right to vest such powers in the courts of justice, with regard to private and local affairs, as may be deemed expedient.”
2. As to the taxing power, the most important and delicate of all the legislative powers, art. 2, § 29, confers upon the legislature “the power to authorize the several counties and incorporated towns in this State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law.”
It is not, nor can it be controverted, that this last section fully covers and sustains the act in question, if the railroad be properly a “county purpose.” But it is insisted in the argument, that it is not so in the sense of the constitution. It is no easy matter to affix a clear and definite meaning to this phrase. It is less difficult *663 to state cases which, do, and others which do not fall within it, than to draw any exact or palpable line between them.
There would be no diversity of opinion on the proposition, that court-houses, jails, poor-houses, and common roads, and bridges, by which they are made accessible to the people, are “ county purposes,” and that hotels, mercantile, trading, banking, and manufacturing establishments would not be, although they may be highly necessary for the comfort and prosperity of the people at large. These are — as they should be — left to private and voluntary enterprise, and cannot, in any just sense, be regarded as public or county purposes. Nor is there any necessity that it should be otherwise, because the prospect of gain will always attract sufficient private capital into those channels. Such enterprises will generally advance with the wants and demands of the community, independent of public aid. No 'authority exists, then, for the delegation, of power to counties and corporations to levy taxes for such purposes; and an act to that effect, as well as any action under it, would be nugatory. "We had a case before us at the present term, Steadman vs. The Mayor and Alderman of Gallatin et als., in which the question was, as to the power of a town corporation to issue their bonds, and levy taxes for stock in a woollen and cotton factory within their limits; and were prepared to decide that this was not a corporation purpose, within the meaning of the constitution, and therefore an act of assembly giving them the power, would have been void; but as the action in that case was without any statute specially conferring the power, it was only necessary to decide, *664 that by tbe general corporate powers of tbe town, corporation debts could not be contracted, or taxes levied for sucb purposes, and consequently tbe bonds were void, and could not be forced upon tbe contractors, wbo bad specially agreed to take them in payment.
But tbe question recurs. Is a railroad a “ county purpose”? If this question cannot be answered in tbe affirmative, tbe act of 1852 is unauthorized by tbe constitution, tbe whole proceeding is a nullity, and tbe mcmdamms must be refused.
One of tbe first wants, next to tbe necessary means of subsistence, in any community, is some mode of reaching each other for social or business intercourse, and mutual assistance and advantage. Wild animals have tlieir trails, tbe Indian bis path, and tbe white man bis roads and bridges. These are indispensable in tbe rudest organizations of society, for both private and public purposes. Tbe tiller of tbe soil needs them to go to tbe mechanic for bis tools, and tbe mechanic to go to tbe farmer for bis supplies, and both to reach tbe trader and tbe merchant for purchase, barter, and exchange, and all together, must have them to pass to and from places set apart for public business or worship. As society advances in civilization and wealth, its necessities in this regard continue to increase, and greater and still greater facilities for intercourse of this bind are demanded. Boads which would suffice for a population of hundreds concentrated at a few points, and making but a small amount for market, would not answer for thousands covering tbe whole face of the country, and rolling up millions of produce for transportation. Tbe advance may be, and generally is, *665 gradual ia this, as in most other things; bat it is as steady and sure as any other kind of improvement ■which results from the wants and argent necessities of a people. So the common dirt road for wagons is superseded by turnpikes, and these again by the railroad. They are all designed for the same, purpose; the passage of persons on business or pleasure, and the transportation of property. They are for the use and benefit of the people locally and generally. Blessings innumerable, prosperity unexampled, have- marked the progress of this master improvement of the age. Activity, industry, enterprise and wealth seem to spring up as if by enchantment, wherever the iron track has been laid, or the locomotive moved. But like most other temporal benefits, it has to be purchased “ at a great price.” Individuals who have the spirit to. do it, are not often sufficient for the task, and everywhere it has been found necessary, by some means, to command the aid of corporations, counties, States, whole' communities. Such is the system adopted in our State, of which the act under consideration is a part. The State subscribes $8000 per mile, (now $10,000, by act of the last legislature,) the counties on the line of the roads, and individuals, both natural and artificial, everywhere, as much as they choose, no more, no coercion, except to enforce such engagements as they • may voluntarily make.
Here, then, is a road to pass through the county of Sumner, touching her seat of justice, bringing to the doors of her citizens all the necessaries and luxuries, both of the north and south, transporting all their surplus productions to the best markets, and her people wherever interest, business, or pleasure may call; and *666 all tliis with that great dispatch which steam alone can impart to matter, and before which space dwindles into a point, and the people of distant States are brought into daily communication.
If, then, an ordinary dirt road, or less common turnpike road, is a “county purpose,” and a proper subject of county taxation, as well as bridges over their streams, because they are local benefits to the people, coupled with an advantage to the public generally, having occasion to pass over them, how can it be said that a railroad is not, which answers all these purposes so much better, and produces a state of prosperity of which they are entirely incapable? Both are roads in the county, and we cannot argue, that because one is better, and more costly, if you please, than the other, the building of it shall not be regarded as a county purpose. Nor can the fact, that it runs into, or through other counties or States, or is owned or managed in whole or in part by others, deprive it of this character. ■ This objection has never been urged, and could not be successfully, to a dirt or turnpike road, and applies with still less force to this. The length and magnitude of. the work can only increase the local advantage to every point it may pass. It is the thing, and its objects and purposes, which defines its character in this respect, and not its extent and magnitude.
But this is not a question of the first impression, though we have thus far considered it in that light. The same question, in principle, came up, and was decided by this court, in the case of Nichol vs. The Mayor and Aldermen of Nashville, 9 Humph., 252. It was there determined, that an act of the legislature *667 authorizing the corporation of Nashville to take half a million of stock in the Nashville and Chattanooga railroad, and issue bonds and levy taxes to pay for the same, was sustained by the clause of the constitution now under consideration, because that was a “ corporation purpose.” The road had its termination at or near the limits of the corporation. The reason given, among others, was, that it tended largely to promote the business and prosperity of the city. Now, if that was a corporation purpose, is this not a county purpose? Is not this the strongest case? This road passes through the whole county, as well as the corporation of the seat of justice in the centre. The same question has often been up in other States, and it is believed that there is but little, if any conflict in the decisions. The question should be regarded by the courts as settled and forever put to rest. Some of the cases, however, have gone further than we would be willing to go, or than this case requires.
The common argument, • that the power of a county or town corporation is confined to their limits, has been everywhere met and refuted or exploded. And the kindred argument, that to constitute a town or county purpose, the improvement or object for which the people are taxed, must be entirely within their borders, has suffered the same fate. 9 B. Monroe, (Ky.,) 526. 5 Gilman, (Ill.,) 405. 1 Jones, (Penn.,) 70. 4 Comstock, (N. Y.,) 419-20. Ohio Reps., 609 to 625. Goddin vs. Crump, 8 Leigh, (Va. R.)
2. 'It is, however, contended, secondly, that if this be a county purpose, still these acts are in conflict with the constitution, because they are not final and obliga *668 tory, but depend, for their vitality, upon the vote of the people; and that this is a transfer of legislative power to the people, which is contrary to our republican system of government, as set up in the constitution, as well as its genius and cardinal principles.
With these latter tests, it may be remarked, we have nothing to do, except so far as they may tend to illuminate what is written in the constitution. If the construction and administration of our laws, supi*eme or subordinate, were to be governed by the opinions of Judges as to the genius or general principles of republicanism, democracy, or liberty., there would be no certainty in the law; no fixed rules of decision. These are proper guides for the legislature where the constitution is silent, but not for the courts. It is not for the judiciary or the executive department to enquire whether the legislature has violated the genius of the government, or the general principles of liberty, and the rights of man, or whether their acts are wise and expedient, or not; but only whether it has transcended the limits prescribed for it in the constitution. By these alone, is the power of that body bounded; that is the touch-stone by which all its acts are to be tested; there is no other. It would be a violation of first principles, as well as their oaths of office, for the courts to erect any other standard.- There is no “higher law” than the constitution known in our system of government. If that does not conflict with, or forbid an act of the legislature, to which all the law-making power is confided, there is no correction, no matter how unwise or oppressive, but by the action of the people at their next election. The courts, in attempting to obstruct, or failing to enforce *669 such, a law, would. Le guilty of usurpation of power and treading on forbidden ground. It would result in a ruinous conflict of authority, obliterate the boundaries of power," and mar, if not destroy, the harmony of that beautiful and well balanced system of government with which we are blessed beyond all other ages or countries. Ko temporary evils, be they ever so oppressive, would compensate for the introduction of a principle fraught with so much danger into our jurisprudence. Then, if we were of the opinion that the act in question was of the most unwise, unjust, oppressive and ruinous character, and yet, was not forbidden by the organic law, but fell within the scope of legitimate legislative action, we could not arrest, but would be solemnly bound to enforce it. For the consequences, we are not responsible. "We have no more power to repeal or disregard, than to 'make law. Our functions' only extend to their construction and enforcement. But, on the other hand, it has become an axiom in our jurisprudence, now no where disputed, and every where adopted and acted upon, that the courts have power, and it is their duty to pass upon the constitutionality of an act of the legislature, and declare it nugatory, if there be an irreconcilable conflict. Tet, the rule is, as generally recognized, that it would be inconsistent with that comity and confidence which should ever subsist between co-ordinate departments of the same government, and the high respect due both to the intelligence and honesty of the people’s chosen representatives, not to decide upon their acts with every presumption in favor of their validity, which should be overcome only by the clearest convictions of judgment, after the most grave and *670 mature examination and profound reflection. 3 Dallas, 171. 4 Ib, 14. 8 Cranch, 87. 14 Mass., 345. 11 Penn. P., 70. 2 Monroe, 178. 9 Dana, 514.
The admitted theory of our government, is, that all power of every kind, is derived from the people, as the natural source, or fountain. In every government, no matter hy what name called, or whether vested in one or many persons, these powers are naturally divided into three classes; the legislative, the law-making; judicial, the law-expounding; and executive, the law-enforcing. These three departments embrace all the powers of government. They were, in the construction of our system by the people, wisely vested in these distinct co-ordinate departments above enumerated, and to be exercised by different persons, or bodies of men. Their union is tyranny; their separation, the only guarantee of liberty. The boundary lines between them were as distinctly marked as the nature of the case would admit. Each was made sovereign in its sphere, but powerless beyond it. They are all agents of the people, and the constitution their power of attorney. All acts beyond this are nugatory and void; but, within it, binding upon all, whether right or wrong, politic or impolitic. No relief can be obtained if the charter is not transcended. Partial evil must be endured for the general good. The harmony of the system must be maintained. The judiciary, with all others, must submit to the commands of the legislature, so long as it revolves in its legitimate orbit, no matter what the consequences may be. The liability to abuse, is incident to all grants of power; and yet, if on this account, no power were delegated to agents, all government would be at an- end, and the law *671 less rule of the strongest, would succeed to the harmony and order of regular government. The basis upon which the'whole American fabric has been erected, is, that the people, being in possession of all power, have the right to partition it out as they think most conducive to their happiness, in the form of written constitutions, by which all invested with power shall be effectually controlled. This is the supreme and paramount law, before which all must bow with reverence. Over its barriers, even the legislature, with its mighty powers for good and evil, cannot pass. This limitation would be worse than useless, if there were no power in the State to decide upon their acts, and to bring them to the test, whenever any controversy arises on the subject. This delicate and important duty has been necessarily devolved upon the judiciary. How could it be otherwise? The judges are appointed and sworn to administer the law, and of necessity they must decide what the law is. In doing this, they are obliged ^o look first to the supreme law, to determine upon any conflict with it that may be alleged. This necessarily involves the right to declare an act of the legislature void, wherever such conflict is found clearly to exist. Fletcher vs. Peck, 8 Cranch, 87. But, where, in the best judgment of the Court, there is no collision, what then? Are the courts to look out some other standard; erect some ideal test, such as their own opinions of right and wrong, justice or injustice, or the general principles of a free government might suggest, and by that annul a solemn act of the lawmaking power? The absurdity to which such a doctrine leads, must, at once, condemn it, with all right-thinking men. There are, however, two standards to which we *672 most refer, to try tbe validity of legislation — tbe constitution of tbe United States and that of our own State. Tbe people bave wisely parcelled out tbeir power to two distinct governments; tbe one, general and national; tbe other, State and local. They both, in all tbeir departments, operate upon tbe same people, and are concurrent and friendly, and not foreign or hostile to each other; both supreme and sovereign in tbe respective spheres assigned to them by tbe real and original soverign power resting in tbe people, for whose benefit and happiness they were created, and by whose voice they are subject any time, to be changed or remodeled. Tbe first, however, is more strictly limited in its action. It is confined to tbe powers expressly given and. those fairly incidental thereto, such as are necessary to carry out and make effectual those expressly granted. Tbe other (but I refer particularly to tbe legislative power of each) is only circumscribed by tbe limitations and interdicts of tbe two constitutions. Tbe enquiry in tbe one case, is, where is tbe authority in tbe charter? — not, is it forbidden? And in tbe other, is it forbidden? — where is tbe prohibition? This is clearly indicated by tbe articles granting tbe power, in tbe two instruments:
“All legislative powers herein granted shall be vested in a Congress of tbe United States, which shall consist of a Senate and House of [Representatives.” Con. U. S., art. 1, § 1.
“ Tbe legislative authority of this State shall be vested in a general assembly, which shall consist of a Senate and House of Nepresentatives, both dependent on tbe people.” Con. of Tenn., art. 2, § 3.
*673 Then, the only legislative powers of Congress are those specified in the instrument — “ herein granted ” — but no others; but those of the general assembly of the State, are general, extending to all powers of government properly denominated, legislative; falling under that class of powers according to the accepted meaning of the words used; not that- which is “ herein granted,” but the “legislative authority of the State” — all the law-making power.
But still, the past experience and sound forecast of the people were too great to leave this immense grant of power without limitations and restrictions. These are carefully and emphatically prescribed in both constitutions. A specimen of these may be found in the constitution of the United States, art. 10, § 1: “ No State shall * * * coin money, emit bills of credit, make any thing but gold and silver coin a tender in payment of debts, pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility.” And in the constitution of Tennessee, art. 1, many of them are set forth. In these and other clauses, we find guards and limitations upon legislative power in the fundamental law. These, as it must be presumed, were regarded as sufficient checks on the power granted, and no othér can be added but by the same authority. Were it not for these restrictions the legislature of Tennessee would be as omnipotent as the parliament of Great Britain is assumed to be by the great commentator; and the same would, or might be the case, if there were no power in the State to hold it to its orbit and enforce the checks and balances of the 'constitution. And these, or worse consequences, *674 might follow, if this restraining power, not so directly under the control of those upon whom all power acts, were allowed to be governed in their action by arbitrary rules established by itself, instead of the written constitution established by the people. The one would be as fluctuating as the opinions and prejudices of men, but the other is fixed and stable. In this, lies the great advantage of a written constitution — a settled, unbending supreme law.
Under the guidance of these general rules and fixed principles, we approach the question before us. Is the act of 1852 forbidden by any clause in the constitution of the United States, or that of the State of Tennessee, because of the reference made to the people?
The question of the constitutionality of a general act of the legislature, which is made in terms to depend for its vitality in every respect, as a condition, upon a vote of the people in its favor, has been very much agitated in the last few years, and in the courts of our sister States, conflicting decisions have been made upon it. That it is a question of difficult solution is fully evinced by the fact, that the first legal minds at the bench and the bar of the nation diflier in their opinions.
The inherent difficulty of the question, as well as the great diversity of opinion upon it, and its high importance, all suggest the propriety of refraining from the expression of any opinion upon the abstract question until a case necessarily involving it, is presented and argued before us, which we do not consider these eases to do.
The writer of this opinion, however, would say for himself, that he is not able to see any thing in the con *675 stitution wbicb would invalidate an act of the legislature on account of such a condition. It is easy to see many objections to it on the score of expediency; that it would be troublesome to the people; might be resorted to by the members for the purpose of avoiding responsibility to their constituents; protract the enactment of proper laws, and unnecessarily agitate the people. And on the other hand, it might save them from some hasty, crude and unacceptable legislation; yet that does not prove any thing upon the question of constitutionality; but these considerations would prevent this course being often, if ever adopted in legislation. It is difficult to see, when it is admitted as it is by every one, that the legislation of Congress or the general assembly may be, as it has often been, conditional; their acts made to depend upon conditions whether they are to go into effect or not; that in a republican government this particular condition, the sanction of the people, would be, by implication, against the constitution. It would seem that, in a popular government, if any condition could be tolerated under the constitution, it would be this; and that in making any great change in the policy of a State, it would not be incompatible with our institutions to. suspend the same, until the sanction of those upon whom it was to operate should be obtained, to the distinct measure proposed, as well after it has been matured by the legislature by a vote of the people, as before by instructions. It is true, the power to make laws has been surrendered by the people, and vested in the legislature) so that no law can be made by, or emanate from them; but this' does not prove that it would be an infringement of the constitution for their representatives *676 to call for, and defer to tbeir opinions, on the subject of a new law fully matured by them in all its parts, before it shall go into effect. But this question is left open, and no opinion given upon it by the court, as before stated, as we do not' consider that this case requires it.
But, in the case under consideration, the court is of the unanimous opinion, and so decide, that the reference to the people of the question of subscription or no subscription of stock, does not invalidate the act by bringing it in conflict with the constitution.
This is a general law, perfect, finished and unconditional. It is not made to depend for its vitality upon the vote of the people, or any other future contingency. Whether Sumner, or any other county, act under it or not, it is still the law of the land, addressing itself to all the counties of the State, until repealed by the authority which gave it being. True, it will only operate in its vigor where and when the state of things provided for should transpire. But this is the case with all laws, criminal and civil. Every statute must apply to some future state of things, and their enforcement must depend upon the happening of the things contemplated — the action of others. The law against murder and larceny would remain dead upon the statute book, if no one would perpetrate the crimes against which they are directed.
But again, this act provides for the creation of a county debt for stock in a road, and a tax to meet it, and this is suspended on a vote of the people, and not the action of the court. The legislature, it is admitted, could do this, or it could empower the court or a corpo *677 ration to do it, but cannot leave it to tbe people! What says the constitution? “The general assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law.” 'Art. 2, § 29. By another section, the “legislature is authorized to vest power over private and local affairs in the courts of justice.” Art. 11, § 8. But here, in relation to the very delicate subject of taxation, the authority to impose taxes for county purposes, (and we have seen that this is such a purpose,)’ is to be communicated to the “ counties,” not to the courts, nor to the justices, nor to the officers. And how shall this power be exercised; by what agency or instrumentality? by the county courts or circuit courts, or by representatives from each civil district selected for that purpose, in convention, or by the people? No. The mode of doing it is left to the general assembly. The authority is to be exercised by the “ counties ” “ in such marmer as shall be prescribed by law.” The legislature, then, have, by the constitution, the unequivocal power to determine and direct how, and in what manner these taxes may be imposed by the counties upon themselves, as well as to what extent and for what purpose. That the county court. may have been empowered to act for the county on this subject, is no objection to the different mode or agency adopted in the act. It may certainly be said with great safety, that as the legislature was expressly entrusted with the selection of the mode and manner of imposing the debt and the tax upon the county,' it could not have adopted a plan more unexceptionable, than to refer the *678 question directly to the tax-payers themselves. It was reasonable and just, the constitution permitting it, that it should be left'to -the people of the county to decide for themselves, in view of the burthens it would impose upon them, on the one hand, and the advantages on the other, whether they would go into it or not. The people might well consider that, although the debt proposed would be heavy, and the taxes onerous, for some years, yet their lands would be greatly enhanced in price, their facilities in trade and business, in transportation of their surplus produce, and intercourse, with the rest of the world, would amply compensate them. The objection to this mode of deciding the matter, even if we were at liberty to decide upon grounds of expediency, which we have seen we are not, that the people are liable to be, and were in this instance, misled by parades, barbecues, and torch-light processions, got up by the friends of the measure, and backed by eloquent speeches by which the voters were gulled, deceived, and carried away, cannot be for a moment entertained. It is striking at the foundation of our institutions, and would annul all popular elections. It is a fundamental principle, in an elective popular government, that the people are capable of self-government, and may be safely trusted with their own interests. Besides, this was a matter among themselves and others, and others interested in their action cannot be affected by it; they cannot be allowed to take advantage of their own wrong in a contest with others. This is not a controversy between the affirmative and negative voters, but between a corporation and the whole county, bound by a vote of the majority. This is a government of majorities; it cannot be otherwise.
*679 Marions oilier clauses of the constitution Lave been referred to in argument, but as we think they bare no application, and are not seriously pressed; they need only be noticed very briefly. Tbe clause wbicb forbids private property to be taken for public use, (Art. 1, § 21,) has no application, because that rests upon tbe doctrine of eminent domain, and this upon tbe right and power of taxation.
They are entirely distinct, and in every respect dissimilar. Tbe former is, when something beyond a mere equal share of tbe public burthens is taken from tbe citizen, and therefore be must be paid by that public to whose use it is applied; it is made a debt against the community of wbicb be is a member. But this debt, as well as others wbicb are contracted for tbe general good, can only be paid by taxation. Tbe amount necessary for this, and all other public purposes, must be raised by exactions upon all in some form of taxation. In relation to this, tbe idea of refunding, or -compensation, cannot be conceived. It would be simply and palpably absurd. Here no man’s property is taken, but a tax imposed.
Tbe clause against partial and private laws is also cited. Con. art. 11, § 7. This is, if possible, still more remote and inapplicable. To prove this, it will be only necessary to read it in connection with § 29 of art. 2. But these objections are but little relied upon, and neeed not be further notieed.
Secondly: It is contended that even if the act of assembly be constitutional in all respects, yet upon various grounds tbe proceeding in this case is void, because its provisions were not pursued, and tbe conditions pro *680 scribed to render the subscription obligatory upon the county have not been performed.
1. The various acts to be performed and orders made by the county court, under the provisions of the act, were done, and performed in this case by the quorum court, when only three justices were present. It is insisted that the act in the use of the words county court, in reference to the subject of taxation, must and did require a number to be 'present sufficient to levy taxes, or at least to appropriate county money. The argument goes further, and insists that wherever that court is simply designated by name, without more, in an act of assembly requiring duties to be performed or powers exercised, a number sufficient to transact miy county business must be present. We cannot yield to the force of this objection. No power to levy a tax, appropriate money, or contract a debt, is conferred by this act. All this is referred to the people. The court lias no discretionaiy, quasi legislative, or judicial power given to it in any part of this act. It is merely ministerial or 'instrumental, in every duty required of it. It is to receive and file the petition of the railroad directory or commissioners, to order and make regulations for elections, receive the-return of the sheriff, and through their chairman subscribe the stock, and levy and have collected the railroad tax. No discretion is any where given, that seems to be studiously avoided by the legislature. The intention evidently was, to commit the whole matter to the people, and provide that their edict in relation to it, should be subjected to no intermediate obstructions, but be fairly and fully carried out by the use of the agencies designated. It cannot be, doubted, *681 but tliat it would have been as competent for tbe legislature to have appointed any other county officers to liare performed these acts, as well as the justices of a county court. But these were' thought most appropriate and suitable. Yet, the duties required were all ministerial. The court are to act under the mandate of the law in carrying out the will of the people, with no more discretion than a sheriff or any other ministerial officer, has in the execution of a writ or any other duty assigned to him by law. Then there can be no reason arising out of the nature of the duty to be performed which would require any particular number, provided there shall be as many as shall constitute a legal court.
The county court, as well as all other inferior courts, is the creature of the legislature.
The constitution provides, that the judicial power of this State shall be vested in one Supreme court, and in such inferior courts as the legislature from time to time may ordain and establish, and the judges thereof, and in justices of the peace. Art. 6, § 1. And by § 3, courts may be established to be held by justices of the peace.
' The legislature of 1835, the first after the adoption of the present constitution, did establish a county court to be held by justices of the peace, and assigned to it its jurisdiction. That and subsequent acts prescribed the number of justices necessary for the exercise of certain specified functions. Three are required to constitute a court for ordinary business; without that number there can be no court; but to lay off roads, appropriate sums of money larger than fifty dollars, and some other things, require a greater number, and to levy taxes a still greater. In either, and in every case the tribunal is *682 denominated a “ county court.” We take tlie correct rule to be, tliat in all cases where no particular number is specially required to constitute the court, that the duty may be performed by three. The legislature being the creator, can certainly shape the creature as it chooses. Then, when a new power is given to, or duty required of the “ county court,” and no particular number of justices are specified, any number which may constitute a legal court can perform it. This conculsion is strength-ended by the fact that in cases where more was required, it so provided in the acts. Here then, was a new duty required of that tribunal without any designation of the number, which should compose if; consequently, if the acts were done by the county court, whether composed at the time of three, or fifty members, the law is complied with, and the action is valid, and binding upon all concerned.
2. The vote of the ' people was taken before the location of the road. The act makes no such prerequisite. True, it says, the question of taking stock in “ any road which passes through or contiguous to. any county” may be put to the people. But it also provides that the commissioners for any road may apply to the court to take the vote, and it shall be ordered. Now, this must be previous to the location, because the organization of the company has not taken place by the election of directors and officers, Such could not bave been the intention of the law, because the particular location of a road often depends upon the prospect of the aid to be obtained at different points from individuals or corporations. But again, if this were an objection, it was obviated by a condition in the order for the election, *683 requiring the road to pass through the county and malee ■ Gallatin a point. And this was ordered by the board of directors, and officially communicatee! before the subscription was made.
3. The condition in the order by which Gallatin was made a point, was a fraud upon the stockholders, as it was out of the direct route, and operated as a bribe upon that portion of the voters. The stock-liolders were represented by the directors who accepted the terms upon a full knowledge of the facts, and the party who proposed the terms cannot be heard to object ■to them. So far as these objections relate to the influence of this condition upon the voters in the vicinity of Gallatin, it can have no effect, as the same objection would apply to the condition requiring the road to pass through the county, as that-h.ad an influence on all the voters. But there wa3 no concealment -or mistake of the facts upon this point, as the conditions were all published and canvassed before the. people.
4. The stock is made payable in five instalments in the order, and the act contemplates but three. This objection would seem to be made under a mistake as to the provisions of the act. In the 8th section, it is provided that not more than' one-third of the stock voted and subscribed shall be required in any one year. It no where prohibits more' instalments and a less amount. This is more favorable to the tax-payers, and cannot be an available objection. If it were a departure from the act, it would not lie in the mouth of the party benefited by it to complain, and more particularly when it was fixed by the vote of that party as a term of the cohtract.
*684 5. The election was carried by fraud, bribery, &c. These grave charges are not proved, and cannot be presumed to be true. The stump speakers may have colored too highly the advantages of the road, misrepresented the law, and made promises which could not be fulfilled. But if this were so, it was a case of the voters acting upon themselves; the relator is not implicated; the rights of the company cannot be affected by it. If objections 'of this kind could prevail against a popular decision, what election could stand? ’Would not the government be without officers ?
6. The order of the court upon which the people voted, was not single and positive, but in the alternative, as to two roads; that is, it proposed that $300,-000 should be subscribed in the Nashville and Louisville road, provided the board of directors located it permanently through Sumner, and made Gallatin a point, on or before the 1st of September, 1852; and if not, then to be subscribed in the Nashville and Cincinnati road. By this, it is insisted, the friends of both roads were brought together, when perhaps neither, alone, could have secured a majority.
Here, again, the argument is at fault, because if this were calculated to unite the friends of both, it would at the same time bring the enemies of each together, and drive off many who might vote for one because it would pass near them, and because of this uncertainty, array themselves against the entire proposition. But, independent of this consideration, we can see nothing in this to invalidate the proceedings. The great object was to have a railroad traversing their county, and there *685 was nothing improper in presenting to them two chances for it — a first and second choice.
There are many other ingenious objections taken to this proceeding under the act of 1852, and pressed upon us with much force and cogency of reasoning, which it would be a useless consumption of time to notice in detail, as we have given to them severally and collectively the most mature consideration of which we are capable, and consider them unavailing, and insufficient to resist this application.
Thirdly. But it is further insisted that if the act of 1852 be not repugnant to the constitution, and the proceedings under it subject to no fatal objection, yet the changes made by the amendatory act of 1853, under which this demand is made, are such as to annul the subscription and render the whole proceeding void. Let us examine it. This act refers to the proceedings under the former act, ratifies and confirms them,' declares the subscription of the stock valid and binding upon the county, but provides a different mode of paying for the stock; that is, by the issuance of the county bonds payable at not less than ten, or more than twenty years, at an interest of six per cent., to be signed by the chairman, provided a majority of the people vote for the change, and the board of directors for the road will agree to it, by receiving them in payment. The question was submitted to the voters and carried in favor of the bonds, and the company agreed to receive them.
It is unnecessary to look to the effect of an affirm-atory act upon a proceeding or contract which was void at the time it occurred, as we have already shown that this is not such a case.
*686 In what light is this transaction to be considered? Is it not a contract? A proposition was made by the railroad company, to the people of Sumner county, through their county court, as an instrument, to subscribe for a certain amount of stock to build that part of the road which passed through their borders; they accepted the proposition, and the contract was closed by the subscription. All this was done, as we have said, in substantial conformity to the law, so as to bind both parties. The contract is closed. The county is bound for the money, and the corporation for the stock. After-wards, by this act, the legislature, under whose authority the contract was made, empower the parties to change it, if they choose, in relation to the time and mode of payment, and some other particulars. The same parties who made the contract- — -the people on the one side, and the board of directors for the road upon the other — agree to it. "Whose rights are affected; what rule of law forbids it? The parties to any contract, may surely change, impair, or even destroy it, by mutual consent. The legislature cannot act retrospectively upon a contract so as to impair its obligation or affect vested rights, but the parties to it may, when no other rights but their own have arisen under it.
How far the power of the legislature -would extend to change and modify the terms upon which the stock was taken, by the vote of the people, without the consent of the parties, need not be investigated, as that is not attempted here. This state of the case would produce the necessity of examining those clauses of the constitution which forbid the enactment of restrospective laws, and preserves the obligation of contracts and the *687 sanctity of vested rights. Upon tbe assumption of this hypothesis, many of the objections taken are argued, and made to rest; and to this they are indebted for their apparent pertinency and force. They are also predicated upon the unfounded assumption that the county court, and not the people of the county, is the contracting party on the one side. And here, several points in the argument may be briefly noticed, which might perhaps have been more appropriately considered before.
1. Counties are not corporations, but civil and political divisions of the State. For some purposes they are merely civil divisions, but for others, they certainly are corporations. They are therefore, sometimes called quasi corporations. They are political, aggregate corporations, capable of exercising such powers- as they may be vested with by legislature. Ang. & Ames, 17, 24. 9 Wheaton, 907. 1 Baldwin, 222. Any body of persons capable of acting as one man, and in a single name fixed by law, having succession, is, in some sense, a corporation. Without' going into all the ramifications of this subject, to be found in the books, it is sufficient to say, that the s counties in our State are clothed with the powers and attributes of corporations to a sufficient extent to be able t.o act and contract; to become debtor and creditor, so as to subject all the persons and property within their limits to taxation in any mode that may be prescribed by the legislature. And whether this be by the action of the county court, or a vote of the people, or any other agency, can make no difference. The legislative power is not restricted, or confined, in this particular, except as to purpose, not as to mode. The only inquiry upon this point, is, what saith the law?
*688 2. If the county should take the stock as a corporation, it must own it as such, and cannot distribute it among the people, and in the proportions they may pay the tax. Why not? Certainly nothing could be more just. It is a debt against all, and for which all are bound as an aggregate mass; but as the debt is discharged, the thing for which it was contracted is distributed to each in proportion .to what he may pay. lie who pays- most money is to own most stock. No provision could be more just and equitable. It would, in some respects, operate unjustly to. retain the stock, when paid for as a county fund, to very many who had borne the burthen of it. The population of a county is constantly fluctuating. One man who had paid a part of the tax removes, and another who paid none of it, comes into the county; in which case, the one who had contributed nothing would have all the advantages of the fund, which might relieve him from county taxes, as well as the road which was built by it; and the other, who had paid and toiled for the benefit, would be entirely deprived of it. Hie distribution of the stock avoids this injustice, as it becomes property and goes, with the owner. If there were no other reason, this would be sufficient to sustain the propriety of this provision of the statute. And as to the discretionary power of the legislature to order it the one way or the other, there can be no question.
But it is said, it cannot be a county purpose as required by the constitution, unless the stock belongs to the county as a corporation. It is not the stock as an investment, to which reference is made in this clause, but the road in which the stock is held. If this were *689 not so, tbe people might be taxed to raise a fund to take stock in a steamboat or factory, or California mining company, provided the authorities should allow it to be done. But the constitution protects people from taxation for speculating enterprises; it can only be done for some local improvement or benefit; the thing to be done with the taxes raised, must, in itself, be a “ county purpose.” The compensation to the payer ■ of the taxes may be in the local benefits alone, to him and his neighbors, or to this may be added stock in the improvement, to the extent of his contribution, as in this case.
3. But it is here objected, that the-result of this proceeding, disguise it as you may, is to make a citizen take stock, whether he will or not; and that is oppression. That is to say, if we understand the argument, that although it might be lawful to tax the citizen to build a road, if that is the end of it, yet, if you make him the owner of stock in it to the extent of his contribution in taxes, and return to him any part of the outlay in tolls or profits, it becomes unlawful and oppressive. It is very true that no man can be forced to enter into a contract for stock in a road, or for any other purpose, without his consent; it is of the essence of a binding contract that the party freely assented to it. But this is not a contract with the individual citizen, but with the community, the aggregate corporation, or body politic, of which he is a member, and by the legally expressed will, and lawful engagements of which he is bound. The consent of such bodies is to be given in such manner as may be prescribed by law. Here it was to be done by *690 the community to be bound, itself, and to be ascertained by the vote of a majority. A majority gave this consent, and entered into the engagement. Shall not the minority be bound by it, and incur equal responsibilities, as well as participate equally in any advantages that may result? Can the minority complain of oppression by the majority, when the latter take the same burthens upon themselves? It is the very first principle of all republican governments, and every free society or organization of men, that majorities must rule and control. Kyd, 422. Angel & Ames, 396-1. 7 Serg. & Rawle, 517. This principle is only limited by positive regulations. II). Has it ever been thought that any contract or lawful imposition of taxes, or other burthens, could be repudiated by the minority because it did not meet their approbation? In every community or society consisting of many, there must be some mode of concentrating the power of action into a single will or purpose. In a despotism, this is in one individual; in an aristocracy, in a few; and in a democracy, or republic, in all. But in each and all, the result is the same; one purpose in action to which all must submit, or there is an end to all government and order. Happily, under our institutions, the principle is held sacred that none are bound, unless a majority agree to it, but then all, every individual equally, whether he approve of the decision or not. Perhaps there never was a tax laid by the legislature, either State or national, by the county court, or even by the people, where the power to do so is by law vested in them, which met the approbation of every tax-payer. *691 A very honest difference of opinion may exist as to tbe tax, or tbe object to be accomplished by it; and to produce action, some mode of settling tbe question must be resorted to. In tbis case, it was made to depend upon tbe result of a popular election; tbe voice of tbe majority bas been beard, and must be obeyed by all. If tbe decision be wrong, or tbe burthen great, it is better to endure it than to abandon a sacred principle which underlays all our institutions. By an abandonment of tbis, if it were in our power to do so, the partial evils of a temporary wrong would be but as tbe weight of a feather to those which would follow. If tbe first principles of our system are abandoned, tbe whole fabric must fall to tbe ground, “and great would be that fall.”
The Davidson county case presents some different questions. Tbe act under which it proceeded, was different from tbe other in a few particulars. It was passed at tbe same session, (act of 1852, cb. 191, § 12 to 20,) and only applied to a few counties, including Davidson. We will only notice a few of tbe points made in tbis case, and none which aré tbe same in both cases.
1. Tbe other act required a majority of tbe “ votes polled” to be for tbe tax, but tbis is in these words: “•'Provided, that neither of tbe said county courts shall so take stock, until tbe question of tbe taking of tbe same shall first have been submitted to tbe voters of tbe county, which it is proposed shall subscribe stock, and a majority of such voters shall have decided in favqr of taking tbe stock proposed.” Again, in § 14, “that whenever tbe majority of tbe voters of• either of *692 the above named counties, shall decide in favor of the proposition that the county shall take stock as proposed, it shall be the duty of the county court,” &c. The question made is, whether this act requires a majority of all the legal voters residing in the county at the time of the election, or only a majority of those who may attend the polls and actually vote. We are referred to the latest State and' county elections, to show the number of voters in the county, and then to the vote on this question to prove that the number of affirmative voters falls very far short of a majority of the legal voters in the county, ’though they exceed, by several hundred, the negative votes. How can we know how many legal voters there are in a county at any given time? We cannot judicially know it. If it were proved that the vote was much larger in the last preceding political election, or by the last census, by the official returns, or the examination of the witnesses, it would only be a circumstance, certainly not conclusive, that such was the ease at the time of this election. But we put our decision of that question upon a more fixed and stable ground. When a question or an election is put to the people, and is made to depend on the vote of a majority, there can be no other test of the number entitled to vote but the ballot box. If, in fact, there be some, or many who do not attend and exercise the privilege of voting, it must be presumed that they concur with the majority who do attend, if indeed they can be known at all to have an existence. Certainly it would be competent for the legislature to prescribe a different rule. But when they simply refer a question to the decision of a majority of the “voters *693 of a county,” it cannot be understood that they mean anything more than those who see fit to exercise the privilege. Great inconvenience would result from the opposite rule. Suppose the vote should be very close, one, two, or a dozen majority, one way or the other, how could the fact be ascertained but by the box of the exact number entitled to vote? It cannot be presumed that this, or any other question submitted to the people, was intended to be involved in such embarrassment. "Whenever it is so intended by the law, it will be expressed, and some convenient mode prescribed to settle any controversy that may arise. They might say, to be sure, that a number equal to a majority of those who voted, at the last election for Governor, or for electors for President, or prescribe any other arbitrary test. Though this might not be the true test of the number then in the county, yet it would be a sufficient approximation to certainty to answer the purpose. This, or any other prescribed test, would be binding, though arbitrary, and of doubtful expediency. But as none such, or any is given by the legislature, we take it for granted, and so construe their language, that it was only intended to look to the ballot-box for the “voters of the county,” and from that allow no appeal. Angel & Ames, 398-9:
2. The respondents say there was at least one civil district in the county in which there was no election held, and the polls not opened. This, it is contended, renders the election void, according to the decision of this court, in Marshall vs. Kerns, 2 Swan, 68. We do not understand the principle settled in that case to go *694 so far. It is an old, familiar rule, that cases are only authority to the extent of point in judgment — the question raised by the facts before the court. The record in that case showed that two men were candidates for the office of circuit court clerk of Campbell; that the majority was three Totes only, and that at one precinct there were at least twenty voters present desiring to vote, and the polls not being open, they were deprived of the privilege. Under that state of facts, the election was declared void, because it was impossible to know whether the successful candidate would have been elected upon a full expression of choice by all who desired and were entitled to a voice in the election. It appeared that voters enough were deprived of the right, and that against their will, to have changed the result. But suppose the majority had been twenty-one, and only twenty attended the unopened ballot-box; or that all who attended there had in fact gone to another, where they did, or might have exercised their franchise; or it did not appear that any one attended, or if any, not enough to have changed the result, if all hád voted one way, could it be successfully insisted that the principle of that case authoritatively applied, and would annul such an election? Certainly not. Such an effect we think could only be produced by express statutory provision. The ground of that decision was, that the facts which appeared in the record, showed that but for this fault of the sheriff, the result might have been different. What would be the effect in a case where a sufficient number attended to change the result, and might have gone from that to another district in time *695 to vote, if they desired to do so, but did not, we need not now say, as the case of Marshall vs. Kerns does not present that state of facts, nor does this.
It may not be out of place here to remark, as the subject seems to be so often and by so many misunderstood, that the generality of the language used in an opinion is always to be restricted to the ease before the court, and it is only authority to that extent. The reasoning, illustrations, or references contained in the opinion of a court, are not authority, not precedent, but only the points in judgment arising in the particular case before the court. The reason of this is manifest. The members of a court may often agree in a decision — the final result in a ease- — ’but differ widely as to the reasons and principles conducting their minds to the same conclusion. It is then the conclusion only, and not the process by which it is reached, which is the opinion of the court, and authority in other cases. The law is thus far settled, but no farther. The reasoning adopted, the analogies and illustration presented, in real or supposed cases, in an opinion, may be used as argument in other cases, but not as authority. In these the whole court may concur, or they may not. So of the principle concurred in and laid down as governing the point in judgment, so far as it goes or seems to go beyond the case under consideration. If this were not so, the writer of án opinion would be under the necessity in each case, though his mind is concentrated upon the case in hand and the principles announced directed to that, to protract and uselessly encumber his opinion with all the restrictions, exceptions, limitations, and qualifications which *696 every variety of facts and change of phase in cases might render necessary.
The case now before us, to which it is insisted we should apply the principle of Marshall vs. Kerns, is thus stated in the answer; and it is a rule of pleading, that if the facts as stated by a party, cannot avail him, it is to be presumed that none sufficient . exist, and the legal result must follow. “And m at least one precinct no election whatever was opened cmd held.” This is all that is set forth, no other fact is stated. If that be admitted by the demurrer to be true, it cannot have the effect claimed, because if there were no other reason, it does not follow from that alone that the general result of the contest was affected by it. The burthen of showing this lies upon those who contest the general return of the sheriff, which must stand and be regarded as sufficient evidence of the result of the election, until the contrary is clearly made out by the contestants. Then there is nothing in this objection fatal to the proceeding.
It is also urged, that the county court set two other days for the election, previous to the one on which it was held, and disappointed the same by countermanding orders, for fraudulent purposes, and by which the people-were confused and deceived. If this was an irregularity, it was not sufficient to invalidate the final election, which was in fact the only one actually held. It is, however, difficult to perceive how this could have had the effect attributed to it. It gave more time for consideration and debate, and more general notice to the people. The agitation produced by these failures and disappointments, and the increasing excitement on both sides, was surely *697 calculated to elicit all the arguments as well against as for the proposition, and bring out a fuller expression of the popular voice. But if this were not so, yet it was the action of the contestants, that is, the county court, in which every justice of the county might have been present; and they cannot be permitted to object to then-own proceedings, their own wrong, if it were wrong. The election was carried, it is said, by illegal votes. That was a case for contest, and cannot be taken advantage of in this mode.
There are other grounds of defense suggested by the ingenuity of the learned and able counsel, both in the answer and briefs, which would receive, and are entitled to our notice and observation, if it were not that this opinion'has already been so much and perhaps unnecessarily protracted. They have all been considered, and according- to the best judgment we have been able to form, present no sufficient answer to the petition for the writ of mandamus.
The judgment of his honor, the Circuit Judge, is therefore, affirmed in both cases.
The bill filed by Sims and others, to enjoin the collection of the taxes levied by the county court of "White, under a proceeding in that county by virtue .of the same act under which the county of Sumner acted, will be dismissed, as was decreed by his honor, the Chancellor.